IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-03020-NYW-NRN

OPTUMRX PBM OF ILLINOIS, INC.,

Plaintiff

v.

NATIONAL BENEFIT BUILDERS, INC.,
RAYMOND J. MARSZALOWICZ,
KEVIN FAHERTY, and
BARRY J. FORESTER,

Defendants.

**ORDER ON PLAINTIFF'S MOTION FOR LIMITED PIERCING OF THE ATTORNEY-CLIENT PRIVILEGE (ECF NO. 74)**

**I.   Procedural Background**

This matter comes before the Court on Plaintiff OptumRx PBM of Illinois, Inc.'s ("OptumRx") Motion for Limited Piercing of the Attorney-Client Privilege (the "Motion"), filed June 28, 2024. ECF No. 74. Defendants National Benefit Builders, Inc. ("NBBI"), Raymond J. Marszalowicz, Kevin Faherty, and Barry J. Forester (collectively, "Defendants") responded on July 8, 2024. ECF No. 79. Plaintiff filed a Reply in support on July 15, 2024. ECF No. 82. The Court held a hearing on the Motion on July 17, 2024. ECF No. 87. At that hearing, the Court granted the Motion to the extent that the Court would conduct an in camera inspection of the disputed privileged documents to which Plaintiff seeks access under the crime-fraud exception. The Court explained that it would then issue a written order determining whether the privilege may be pierced with respect to these documents. *Id.*

II.     **Factual Background**[1]

This is a complicated case. The history leading to the lawsuit is complicated. The claims are complicated. And the circumstances surrounding the claim that the disputed documents should be disclosed to Plaintiff based on the crime-fraud exception are complicated.

Plaintiff OptumRx is a Delaware corporation, based in Minnesota. OptumRx provides pharmacy benefit management ("PBM") services to its clients. OptumRx maintains a network of retail pharmacies, called "Participating Pharmacies," which enter into direct contracts with OptumRx. Under these agreements, the Participating Pharmacies agree to provide certain negotiated discounts on prescription drugs to OptumRx's clients. In turn, OptumRx contracts with its clients to provide access to the discounts provided for by OptumRx's network of Participating Pharmacies under OprtumRx's Participating Pharmacy agreements.

Defendant NBBI is a New Jersey corporation based in that state, and Defendants Marszalowicz, Faherty, and Forester are current or former executives with NBBI. NBBI provides, markets, and distributes prescription drug discount cards that allow its cardholders to receive discounts on prescription drugs. To effectively market and distribute prescription discount cards, NBBI maintains a nationwide network of brokers. NBBI does not maintain its own pharmacy network. Instead, NBBI contracts with PBMs, and relies on the PBMs' pharmacy networks to provide prescription discounts to its cardholders.

---

[1] These facts are taken from the First Amended Complaint, ECF No. 95.

HealthTran, LLC is the former name of a Delaware LLC, which, after a series of mergers and transactions, ultimately became OptumRx Discount Card Services, LLC, an entity whose contract rights are owned by OptumRx. This lawsuit has its origins in a written contract between NBBI and HealthTran, LLC, dated May 5, 2006, as amended ("NBBI Agreement"). Pursuant to the terms of the NBBI Agreement, OptumRx agreed to provide specific discount card services to NBBI. Those services included the payment of specified fees for qualifying prescription drug claims dispensed to cardholders utilizing NBBI's prescription discount card to obtain prescriptions at the discounted rates negotiated by OptumRx. In exchange, NBBI promised and represented that all pharmacy claims submitted by its cardholders through any retail pharmacy would be processed exclusively by OptumRx under the pricing provisions of the NBBI Agreement.

Over the years, the NBBI Agreement was amended and extended. As part of a 2012 amendment, OptumRx increased the confidential per-claim commission amount it would pay NBBI for each qualifying discount card claim. NBBI agreed that the pricing was confidential, and that OptumRx would remain the exclusive PBM that would process all of NBBI's discount card claims under the NBBI Agreement.

An entity known as United Networks of America, Inc. ("UNA") operates a business similar to NBBI—it also issues discount cards to consumers for the purchase of prescription drugs. While UNA and NBBI are competitors in the discount card business, they maintain a friendly relationship. In 2013, OptumRx entered into a contract with UNA ("UNA Agreement"). Similar to the NBBI Agreement, OptumRx agreed to pay UNA a fee for qualifying claims. Importantly, under the UNA Agreement,

OptumRx agreed to pay UNA a higher per prescription qualifying fee than it was paying NBBI.

It is alleged that, unbeknownst to OptumRx, NBBI and Defendants Marszalowicz, Faherty, and Forester were fully aware that OptumRx and UNA were exchanging confidential drafts of the UNA Agreement in the fall of 2013. Without informing OptumRx, Defendants improperly disclosed the confidential NBBI pricing provisions to UNA. It is further alleged that during the negotiations between OptumRx and UNA, NBBI and the individual Defendants developed and implemented a scheme to defraud OptumRx.

The alleged fraud focused on a provision of the 2013 UNA draft agreement, pursuant to which OptumRx would agree to pay the UNA commission fee for any discount card programs acquired by UNA. The alleged scheme was to deceive OptumRx by waiting until after the UNA Agreement was fully executed on December 10, 2013, and then almost immediately announce that UNA had "acquired" NBBI's discount card programs (when no such acquisition had actually occurred) so that OptumRx would believe that it was contractually required to pay the higher qualifying commissions set forth under the UNA Agreement for the prescription drug claims submitted by NBBI's cardholders to OptumRx's Participating Pharmacies ("NBBI Claims") instead of the lower commissions specified in the NBBI Agreement.

It is alleged that under this fraudulent scheme, UNA and Defendants intended to split the increased commissions on millions of claims submitted by NBBI cardholders to OptumRx's Participating Pharmacies. With no knowledge of the (alleged) scheme, OptumRx executed the UNA Agreement on December 10, 2013.

It is further alleged that "in furtherance of the fraudulent scheme," just eight days after OptumRx executed the UNA Agreement, Defendants represented to OptumRx that UNA had "acquired" NBBI's discount card programs effective December 17, 2013 and that they expected, beginning January 1, 2014, OptumRx to process NBBI Claims under the UNA Agreement as a result of the supposed "acquisition."

According to OptumRx, the representation that UNA had acquired the NBBI programs as of December 17, 2013 was false. Per the First Amended Complaint, UNA had not acquired the NBBI programs, and UNA and Defendants had developed their scheme for the purpose of misleading OptumRx into believing that the higher commission schedule under the UNA Agreement applied to NBBI Claims.

According to OptumRx, it requested on multiple occasions independent verification of the alleged "acquisition," including asking for a copy of the acquisition agreement. But, according to OptumRx, there was no written agreement in December of 2013 related to the sale of NBBI's discount card programs to UNA. And no consideration was paid in December of 2013. According to OptumRx, in response to OptumRx's requests for written proof of an acquisition, Defendant Marszalowicz and UNA executives Ryan Jumonville and Robert Davies prepared a phony "acquisition" agreement in July 2014 and backdated it to December 17, 2013. The First Amended Complaint alleges that the backdating can be proved because minutes after OptumRx requested documentary proof of the alleged acquisition on July 16, 2014, an attorney for Defendants downloaded a template purchase agreement from a public website which then became the initial draft of the phony acquisition agreement that was backdated and provided to OptumRx in furtherance of the alleged fraud.

OptumRx insists that there was never any acquisition and that, at all relevant times, Defendants and NBBI continued operating NBBI's prescription discount card programs NBBI had allegedly sold to UNA, as if those programs were still owned by NBBI. In other words, there was no change in control of NBBI or in the personnel managing NBBI's prescription discount card programs and UNA did not pay Defendants or NBBI anything on or around the time of the "sham" closing. As further evidence of the sham transaction, OptumRx points to the fact that NBBI never transferred any of its trademarks or other intellectual property associated with its prescription discount card programs to UNA. This was in conflict with the unambiguous terms of the supposedly phony and backdated acquisition agreement.

As a result of the scheme, OptumRx claims that tens of thousands of pharmacy claims, which should have been processed and paid under the terms of the NBBI Agreement were instead processed and paid under the higher per qualifying claim rates of the UNA Agreement. Thus, OptumRx was deceived into paying commissions higher than it was contractually obligated to pay under the NBBI Agreement.

## III. The Present Discovery Dispute

This dispute concerns 36 documents and communications referenced in NBBI's privilege log (the "Alpert File," in reference to Justin Alpert, an attorney who provided advice to NBBI). These documents were produced with redactions by NBBI's former counsel, Holland & Hart, LLP ("Holland & Hart"), on April 26, 2024. OptumRx emphasizes that NBBI did not voluntarily produce the Alpert File. Instead, Holland & Hart independently located the file by identifying and reaching out to Alpert as someone with knowledge. Per OptumRx, these materials show that Defendants have been

concealing evidence from and making false representations to tribunals since 2017. They have also been lying to OptumRx since December of 2013. Indeed, once Holland & Hart learned of and analyzed the Alpert File, the firm withdrew responses to a number of interrogatories and moved to amend the scheduling order to modify the Defendants' statement of defenses. The Holland & Hart letter disclosing the Alpert File and the associated privilege log concluded with the words, "[i]n addition, professional considerations require that we terminate our representation. We will file our motion shortly." ECF No. 74-2.

According to OptumRx, in December of 2013, NBBI sought attorney Justin Alpert's advice and assistance to carry out its fraudulent scheme. OptumRx says that when Alpert was retained on December 19, 2013, NBBI and UNA had already announced the false "acquisition" for the purpose of increasing NBBI's commission rate. But they had not finalized their own agreement regarding how they would split up the bounty. OptumRx says that is why NBBI engaged Alpert—to counsel NBBI with respect to the relationship with UNA and how the funds could be divided up. Alpert allegedly also counseled NBBI on how to structure its access arrangement with UNA on a go-forward basis, despite NBBI having represented to OptumRx that UNA acquired NBBI's discount card services mere days or weeks prior.

OptumRx insists that because NBBI was communicating with Alpert in furtherance of the ongoing fraud, the crime-fraud exception to the attorney-client privilege makes discoverable NBBI's specific communications with Alpert from December 19, 2013 through (at least) July 16, 2014. See ECF No. 74 at 5.

Per OptumRx, the portions of the Alpert File that have been produced show that events that purportedly occurred in December 2013 regarding UNA's alleged acquisition of NBBI's prescription discount coupon card programs were nothing more than a fabricated "story." Included among the unredacted materials is an unprivileged email in which Jumonville recites his "proposed story" to [OptumRx's predecessor]: "Effective December 17, 2013, UNA reached a deal with NBBI to acquire all of NBBI's Rx business. As part of this deal NBBI has been retained to manage this business for a period of five (5) years." Jumonville continues, "I don't think we need to provide any additional details. I plan on asking them to transition the current biz to our contract effective Jan 1, 2014. How does this sound to you gents?" ECF No. 74 at 8.

OptumRx further alleges that on December 30, 2013, two weeks after telling Optum the "phony" acquisition "story," Defendants sent UNA a draft "Binding Memorandum of Understanding," drafted by Alpert, that provided that "NBBI shall continue to own all of its claims" and "UNA shall pay to NBBI $4.00 per Commissionable Claim generated through NBBI's prescription Discount Coupon Program. UNA shall make all payments due to NBBI within two (2) business days of UNA's receipt of respective payment from [OptumRx's Predecessor]." ECF No. 74-12 at 3–4. OptumRx cites other documents that seem to indicate the alleged acquisition by UNA of NBBI's claims did not happen and was not intended. See ECF No. 74-13 at 10 (paragraph 3.4 of draft "formalized contract" reciting that NBBI was to retain "sole authority to control and administer its Programs").

Per OptumRx, the reason for this deception was simple: money. At the time, NBBI's programs generated over 400,000 commissionable claims per month. UNA's

8

contract provided for a commission of $4.40 per commissionable claim, while NBBI's contract provided for $2.25 per commissionable claim. Thus, Defendants' and UNA's "story," if believed, would increase OptumRx's payout on NBBI's discount card claims by more than $860,000 per month. Over the ten years of the UNA Agreement, this would lead to an allegedly unwarranted payout of $103,200,000 from OptumRx.

OptumRx argues that Alpert was retained to formalize and define the relationship between NBBI and UNA, with key issues being how the funds would be divided up, NBBI's right to walk away, and NBBI's rights to payment from UNA if OptumRx failed to pay UNA on NBBI's claims.

Critically, OptumRx emphasizes that the Alpert File does not contain a copy of the Purchase of Business Agreement ("PBA") that was supposedly executed on December 17, 2013. OptumRx says there is no electronic evidence that this PBA existed prior to July of 2014. The first evidence came on July 16, 2014, when an online business purchase agreement template was downloaded forty-five minutes after OptumRx asked for proof of an "acquisition agreement, appropriately redacted."

In sum—the alleged fraud supposedly perpetrated here was that UNA and NBBI created a fictitious story of an acquisition in order cause OptumRx to pay commissions at the higher UNA rate, rather than the lower NBBI rate. So, the "story" of an acquisition was told to OptumRx when there was really no acquisition. NBBI retained control and ownership of its own claims and no money was paid by UNA to NBBI.

For their part, Defendants in their papers initially argued that OptumRx had not even made a threshold prima facie showing that would justify an in camera inspection of the disputed Alpert File documents. But, at oral argument on the Motion, defense

9

counsel invited the Court to review in camera the unredacted Alpert File, suggesting that nothing therein would support the conclusion that Alpert's work was in furtherance of a fraud. Therefore, at oral argument, the Court concluded that it would conduct the requested in camera inspection of the entire, unredacted Alpert File to assess whether Mr. Alpert was involved (unwittingly or not) in advancing Defendants' allegedly fraudulent conduct.

Defendants' main argument is that nothing in the Alpert File shows that a fraud occurred. Instead, Defendants insist that the documents cited by OptumRx "simply show that UNA and NBBI were in fact discussing and negotiating the acquisition of the NBBI Claims by UNA before December 17, 2013, and also that they continued discussions and negotiations thereafter." ECF No. 79 at 9. Per Defendants, "There is nothing nefarious about parties to a contract having ongoing discussions and negotiations regarding their commercial relationship." *Id.* Defendants also insist that it is an "undeniable fact that parties to a contract need not reduce their agreement to writing for the contract to be enforceable or that parties to contracts often give retroactive effect to contracts, as they see fit." ECF No. 79 at 10. The obvious rejoinder to these arguments is that if UNA and NBBI had had an oral agreement all along, and the written document was merely a memorialization created in July of 2014, then why lie about it for so many years? Why insist for so long that the deal had been papered and executed in December of 2013, if it did not matter whether it was signed then because an oral agreement is supposedly enforceable?

On the substance of whether fraud occurred, Defendants assert that this issue has already been considered in detail by the arbitrator who decided a parallel dispute

between UNA and OptumRx (and its predecessor Catamaran). The Court has reviewed the Arbitration award (found at ECF No. 79-1) and can conclude that, while the arbitrator ultimately found that OptumRx had failed to meet its burden of proving fraud in the purported acquisition, there were substantial questions in the mind of the arbitrator, about the legitimacy of the supposed December 2013 acquisition by UNA of NBBI's book of business. Extended excerpts from the arbitration award show that the arbitrator was so perplexed by the facts surrounding the supposed December 2013 acquisition that, although he could not conclude that OptumRx/Catamaran had proven its affirmative defense of fraud, he similarly refused to find that UNA had proven that an acquisition had in fact occurred in December 2013:

> Instead, we have doubt as to the nature of the transaction between NBBI and UNA, raised by Catamaran at the time, and ever since. Catamaran has stated that it received no proof of the transaction, although it was not entitled to specific proof or disclosure under the Agreement and based upon that, doubted that a transaction even took place. Catamaran has accused UNA of making a "Network Access" deal with NBBI, to effectively rent the NBBI Book, submit it to Catamaran to be paid the claims at UNA's rate ($[redacted]) and remit a portion to NBBI. Catamaran asserted that a deal of the magnitude of a purchase of the NBBI Book, plans, accounts, or other assets, could not have been accomplished in the short time between the signing of the UNA-Catamaran Agreement, nor was it initialed after the UNA-Catamaran Agreement was signed. Catamaran has asserted that it is not logical or good business for NBBI to sell its Book for essentially "no money down" and no payments for years to NBBI for their greatest asset. Catamaran claims that it is unreasonable to agree that a transaction took place, and that logic suggests that no purchase ever took place, or at least not at the time UNA claims, and it should not have top [sic] recognize the claim by UNA for payments on the NBBI Book.

> Again, if UNA had provided a Purchase Agreement to Catamaran, there would be no argument about what was logical. If a Purchase Agreement signed by NBBI and UNA existed in December 2013, that stated the terms as "no money down, payments later" then Catamaran would have to concede that although a bad business deal in their estimation, the owners of NBBI were free to make a bad deal if they wanted. Likewise, if a Purchase Agreement was dated December 17, or 18, 2013, there would be no

11

question as to whether a transaction took place after the signing of the UNA-Catamaran Agreement, even if it was negotiated in a few days. By not producing a Purchase Agreement in December 2013, or January 2014, UNA allowed Catamaran to argue that one did not exist and thus no transfer of the accounts had taken place. If there was a Purchase Agreement dated December 2013, Catamaran would not be able to argue that it was only a Network Access deal between the Parties, and because of this Catamaran was not obligated to pay UNA for the Claims.

Because UNA did not definitively prove the existence of a purchase of the NBBI Book, and Catamaran does not agree that any such sale took place, we must look to the actions and statements of the Parties to inform us as to the events of December 2023, and the likelihood or not that a contract existed in December 2013. . . .

It was extremely beneficial to UNA that the NBBI Book be recognized as part of the UNA Book. UNA could have made this absolute by producing a Purchase Agreement at the time, but it did not.

When UNA later produced an Agreement, signed by NBBI and UNA, there were enough questions about it to make it less than absolute fact that the Agreement was signed on the date stated. UNA could still have established the existence of the Purchase Agreement through testimony and other evidence, including testimony from NBBI. . . .

UNA ultimately produced a Purchase Agreement between UNA and NBBI. UNA asserted that it was signed in December 2013, while Catamaran asserted, through testimony and written evidence, that the Purchase Agreement was not signed until at least July 2014. Catamaran asserted that UNA deliberately "back-dated" a Purchase Agreement and attempted to use it to sustain its claim that the deal with NBBI was signed in December 2013. ***If true, then UNA committed fraud, as generally understood, and should not benefit from the "back-dating" of the document. UNA disputed that it backdated any documents but could not produce all the representative copies of the Purchase Agreement it relied upon, thus allowing Catamaran to reasonably assert that the documents either did not exist, had been destroyed, or did not support the purchase as asserted by UNA. UNA's inability to produce a document that was without question executed at the time they stated leaves open the ability of Catamaran to question the entire transaction.*** Since UNA has the burden of proof in making the claim that the NBBI Book was purchased before the Agreement was terminated by Catamaran, the absence of the contract being produced in December or January 2023-4 is not helpful to UNA. . . .

12

> The key question then is when did UNA acquire the NBBI? The Parties agree that UNA owns or controls the NBBI Book now, and owned or controlled the NBBI Book when UNA moved the UNA Big Book and the NBBI Book to another PBM (the subject of the tortious interference claim by Catamaran, to be addressed later), but when did UNA own/control the NBBI Book in 2013-2014?
>
> The answer is, we cannot tell when, prior to moving the NBBI Book to another PBM, that UNA owned the NBBI Book. Since NBBI did not protest or try to prevent the move away from Catamaran, we conclude that UNA owned the NBBI at least by the time it was moved. In the time between December 2013 and the move to ProCare, it is likely that UNA perfected its purchase, but there is not sufficient evidence to conclude that the purchase/sale of the NBBI was made in time to bring it under the Agreement and allow it to be billed at the UNA rates, *before the Agreement was terminated by Catamaran*. As stated, when we started this discussion, "How easy it would have been to establish the valid purchase of NBBI in December 2013, by the production and disclosure of a Purchase Agreement for the NBBI assets, plan, business lines or accounts (or other assets)?"
>
> UNA will not prevail on its claim for payment for the NBBI at the UNA rates in the Agreement, due to insufficient evidence to support that conclusion, and at least a credible question of facts regarding the purported NBBI Purchase Agreement by Catamaran. This is not to say that Catamaran prevails in its allegation of fraud, because beyond raising the doubt as to UNA's claim, Catamaran did not sufficiently prove that a fraud had occurred, and that UNA should be barred from recovery. Catamaran's Affirmative Defenses which are contrary to finding in this category have been considered and are **DENIED**.

ECF No. 79-1 at 20–27 (*United Networks of America, Inc. v. Catamaran PBM of Colorado, LLC and Optum RX*, Final Award, Claim No. 3465, issued October 5, 2023) (Risner, Arb.) (underlined emphasis added).

From this, one can draw the conclusion that the arbitrator could not determine whether an acquisition actually occurred in December of 2013. The arbitrator also could not conclude definitively whether a fraud had occurred. However, as shown in the bolded and italicized portion of the award excerpt above, the arbitrator was unequivocal that if Catamaran had been able to conclusively show that the purchase agreement

13

produced for the first time in July of 2024 had been intentionally backdated, then the conclusion would have been that UNA committed fraud. *See id.* at 24 ("If true, then UNA committed fraud as generally understood. . . .").

Today, the backdating issue appears to be almost a given. There is no evidence that the final signed document was prepared in December of 2013. Drafts appeared for the first time in July of 2014. Interrogatory responses asserting that the document was produced and executed in December of 2013 have been withdrawn. At the very least, there is probable cause to believe that a fraud occurred on the issue of the backdating.

## IV. Legal Principles

The Parties generally agree on the legal principles that govern OptumRx's motion. Where, as in this case, subject matter jurisdiction is premised on diversity, the court must apply Colorado state law governing attorney-client privilege. *See White v. American Airlines, Inc.*, 915 F.2d 1414, 1424 (10th Cir. 1990) ("In a civil case based upon a state cause of action, state law controls the determination of privileges."). Privileges, such as the attorney-client privilege, further the administration of justice and "should not be set aside lightly." *See McNeil-PPC, Inc. v. Procter & Gamble Co.*, 138 F.R.D. 136, 138 (D. Colo. 1991). However, privileges also serve to withhold relevant information from the finder of fact and for that reason should be narrowly construed. *See Montgomery v. Leftwich, Moore & Douglas*, 161 F.R.D. 224, 225 (D.D.C. 1995).

That said, the attorney-client privilege must give way when an attorney's advice has been sought in furtherance of a crime or a fraud. *See Plaza Insurance Company v. Lester*, 14-cv-01162-LTB-CBS, 2015 WL 3528336, at *7 (D. Colo. June 4, 2015). For the crime-fraud exception to allow the discovery of otherwise privileged material,

14

> [t]he evidence must show that the client was engaged in or was planning the criminal or fraudulent conduct when it sought the assistance of counsel and that the assistance was obtained in furtherance of the conduct or was closely related to it. The exception does not apply if the assistance is sought only to disclose past wrongdoing, but it does apply if the assistance was used to cover up and perpetuate the crime or fraud.

*In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998) (internal citations omitted). As the Colorado Supreme Court has stated,

> "The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—ceases to operate at a certain point, namely, where the desired advice refers <u>not to prior wrongdoing</u>, but to <u>future wrongdoing</u>."

*In re 2015-2016 Jefferson Cnty. Grand Jury*, 410 P.3d 53, 59 (Colo. 2018) (quoting *United States v. Zolin*, 491 U.S. 554, 562–63 (1989)).

For the Court to assess whether to pierce attorney-client privilege based on the crime-fraud exception, it must determine how to proceed procedurally. Obviously, it is inefficient and unworkable to have a full trial to determine whether a crime or fraud has occurred, simply to make a preliminary decision on discoverability of evidence. The Colorado Supreme Court articulated a two-step procedure and laid out the standards for evaluating the crime-fraud exception in *In re 2015-2016 Jefferson Cnty. Grand Jury*:

> [A] party seeking to invoke the crime-fraud exception and defeat the attorney-client privilege in Colorado must do so as follows. First, the party must make a threshold showing of facts adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the exception has occurred. If this initial, minimal showing is made, the trial court may, at its discretion, order the production of documents for in camera review. Second, to ultimately decide that a document in question should be stripped of privilege, a higher burden must be met: The party seeking to defeat the privilege must demonstrate probable cause to believe that a crime or fraud was being attempted or committed and that the communication was made in furtherance of the crime or fraud.

15

*Id.* at 61. With respect to the first step, the Court only determines whether the plaintiff has presented prima facie evidence sufficient to support the exception. A prima facie showing would be "'facts adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the crime or fraud exception to the attorney-client privilege has occurred.'" *Martensen v. Koch,* 301 F.R.D. 562, 573 (D. Colo. 2014). The movant must provide evidence that the privileged communication is reasonably related to and in furtherance of the crime. "[T]he evidence must demonstrate that the client was engaged in or was planning the criminal conduct when it sought the assistance of counsel and that the assistance was obtained in furtherance of the conduct or was closely related to it." *Id*. at 574. The necessary showing does not require that the attorney from whom the client received advice was a knowing participant in the crime or otherwise culpable. *Id*.; *see also In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984) (attorney-client "communications are properly excluded from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of . . . an improper purpose."). "Ultimately, the moving party must make a sufficient showing that the privileged communication is reasonably related to and in furtherance of fraudulent conduct." *Plaza Insurance Company*, 2015 WL 3528336 at *8.

## V.     Decision

As noted, the Court determined at oral argument that it would conduct the in camera inspection, implicitly concluding that OptumRx had made the requisite prima facie showing specified in *In re 2015-2016 Jefferson Cnty. Grand Jury*. Having reviewed the disputed documents, the Court must now decide whether Plaintiff has established

probable cause to believe that the Defendants were engaged in an attempted fraud, and whether the communications contained in the Alpert File were made in furtherance of that fraud.

The Court has the reviewed the entirety of the disputed material. It is fair to say that there is nothing particularly earthshaking in the redacted portions of the Alpert File, at least in the mind of this Court. Of course, the Court is not as familiar with the intimate details of this case as lawyers who have worked for years on the dispute, and there may be specifics that would jump out to an advocate more schooled in the specifics of the business and the history between these parties. But there is enough there to recognize that the redacted information (as well as the unredacted information) is generally consistent with OptumRx's theory that no acquisition agreement was drafted or specifically agreed to in December 2013. Instead, it appears that Mr. Alpert was enlisted to paper a transaction that differed in material respects from what was represented to OptumRx/Catamaran at that time. In other words, whatever the documentation being drafted by Mr. Alpert, it does not appear to be consistent with a December 2013 acquisition by UNA of NBBI's book of business. For example, language in a draft memorandum of understanding between UNA and NBBI dated December 30, 2013 explicitly states that the agreed plan between NBBI and UNA was that "NBBI shall continue to own all of its claims." ECF No. 74-12 at 3.

For these reasons, the Court concludes that there is probable cause to believe that Mr. Alpert was retained for the purpose of drafting documents that would be used to execute a plan inconsistent with what had been represented to OptumRx/Catamaran and in furtherance of a fraud. As the arbitrator concluded, if the Purchase Agreement

was backdated, then UNA (and presumably Defendants in this case) were involved in a fraud. The Court concludes there is probable cause to believe this occurred here and that therefore no attorney-client privilege should attach to the Alpert File.

It is therefore ORDERED that Defendants produce the unredacted Alpert File to the Plaintiff within 5 days from the date of this Order.

Date: October 16, 2024

_____
N. Reid Neureiter
United States Magistrate Judge