**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 23-cv-03020-NYW-NRN

OPTUMRX PBM OF ILLINOIS, INC.,

      Plaintiff,

v.

NATIONAL BENEFIT BUILDERS, INC.,
RAYMOND J. MARSZALOWICZ,
KEVIN FAHERTY, and
BARRY J. FORESTER,

      Defendants.

_____

NATIONAL BENEFIT BUILDERS, INC.,

      Counterclaimant,

v.

OPTUMRX PBM OF ILLINOIS, INC.,

      Counter-Defendant.

---

## ORDER

---

This matter is before the Court on two Motions:

(1)     Defendants' Motion to Partially Dismiss First Amended Complaint Pursuant to Fed. R. Civ. P. 9(b), 12(b)(1), 12(b)(2), and 12(b)(6) ("Motion for Partial Dismissal") by Defendant National Benefit Builders, Inc. ("NBBI") and Defendants Raymond J. Marszalowicz ("Mr. Marszalowicz"), Kevin Faherty ("Mr. Faherty"), and Barry J. Forester ("Mr. Forester" and collectively with Mr. Marszalowicz, and Mr. Faherty, "NBBI

1

Executives," collectively with NBBI, "Defendants"), [Doc. 97, filed September 18, 2024],[1] and

(2)    Plaintiff's Motion to Dismiss Defendant National Benefit Builders, Inc.'s Counterclaim Under Fed. R. Civ. P. 12(b)(6) ("Motion to Dismiss Counterclaim" and collectively with Motion for Partial Dismissal, "Motions") by Plaintiff OptumRx PBM of Illinois, Inc.'s ("Plaintiff" or "Optum"), [Doc. 108, filed December 6, 2024].

Plaintiff responded to Defendants' Motion for Partial Dismissal, [Doc. 101], and Defendants replied, [Doc. 105].   Defendants responded to the Motion to Dismiss Counterclaim, [Doc. 114], and Plaintiff replied, [Doc. 115].   Based on the analysis contained herein, the Motion for Partial Dismissal is respectfully **GRANTED in part and DENIED in part** and the Motion to Dismiss Counterclaim is respectfully **DENIED**.

## BACKGROUND

### I.    Factual Background

This case stems from a dispute regarding commission fees associated with the processing of prescription drug claims through a discount card provider.  [Doc. 95 at ¶ 1]. The facts herein are drawn from the Amended Complaint and Answer to the Amended Complaint and are taken as true for the purposes of this Order, unless otherwise noted.

Optum provides pharmacy benefit management ("PBM") services to its clients, and these services include facilitating the delivery of prescription drugs.  [*Id.* at ¶ 18].  To that end, it contracts with and maintains a network of retail pharmacies ("Participating Pharmacies") as part of a "Pharmacy Network" ("Pharmacy Network").  [*Id.* at ¶¶ 18–19].

---

[1] Where the Court refers to the filings made in the Electronic Case Files ("ECF") system in this action, it uses the convention [Doc. ___] and identifies the page number as assigned by the ECF system.

Participating Pharmacies agree to provide certain negotiated discounts of prescription drugs to Optum's clients.  [*Id.* at ¶ 19].  Plaintiff offers its clients access to its Pharmacy Network through separate, individualized contracts.  [*Id.* at ¶ 20].  NBBI is one of Plaintiff's former clients, and Mr. Marszalowicz, Mr. Faherty, and Mr. Forester are NBBI's Chief Financial Officer, Chief Executive Officer, and Executive Vice President, respectively.  [*Id.* at ¶¶ 7–9].  NBBI markets and distributes discount cards that allow cardholders to receive discounts at Participating Pharmacies within Plaintiff's Pharmacy Network.  [*Id.* at ¶ 21].

### A. The NBBI Agreement, the 2012 Amendment, and the Assignment and Assumption Agreement

On May 5, 2006, NBBI and HealthTran, LLC ("HealthTran"), a Colorado-based limited liability company, executed an agreement ("NBBI Agreement") whereby NBBI designated HealthTran as its exclusive provider of PBM services.  [*Id.* at ¶¶ 11, 23–24].  In exchange, HealthTran promised to provide certain services and to pay NBBI commission fees on a per-claim basis.  [*Id.* at ¶ 23].  The NBBI Agreement contained a clause ("forum selection clause"), which provided for "the exclusive jurisdiction of the courts within the State of Colorado in any action or proceeding instituted under this Agreement."  [*Id.* ¶ 12; Doc. 1-1 at 7 § 5(g)].[2]

In June 2012, the Parties executed an amendment to the NBBI Agreement ("2012 Amendment"), which extended HealthTran's tenure as NBBI's exclusive PBM services provider for five years, increased NBBI's per-claim commission, and stated that the pricing in the contract was confidential.  [Doc. 95 at ¶ 25; Doc. 1-1 at 12–13].  Optum further

---

[2] Due to a filing error, the Amended Complaint has multiple ECF stamps, obscuring the page numbers.  Accordingly, the Court will refer to the exhibits as filed with the original Complaint.

asserts that the "legal claims set forth [in the Amended Complaint] which accrued to HealthTran, LLC [and] OptumRx Discount Card Services, LLC . . . were transferred to and are now owned by successor in interest, Plaintiff OptumRx."  [*Id.*].

On June 23, 2022, Optum Discount Card Services and Plaintiff executed an Assignment and Assumption Agreement.  [Doc. 90-1].  The Assignment and Assumption Agreement states in pertinent part:

> OptumRx Discount Card Services, LLC wishes to assign the Contracts to a current affiliate organization, OptumRx PBM of Illinois. . . .  OptumRx PBM of Illinois, Inc. shall assume all of OptumRx Discount Card Services, LLC's obligations, rights, and liabilities under the Contracts as of the Effective Date.

[*Id.* at 2].  The Assignment and Assumption Agreement lists the NBBI Agreement as one of the assigned contracts.  [*Id.* at 3].  Optum asserts that "HealthTran, LLC, is the former name of a Delaware limited liability company, with its original principal place of business in Denver, Colorado."  [Doc. 95 at ¶ 10].  In November 2014, as a result of several corporate mergers and transactions, HealthTran changed its name to Catamaran PBM of Colorado, LLC and then to OptumRx Discount Card Services, LLC.  [*Id.*].  Through a series of corporate transactions, that company no longer exists and the legal claims set forth herein which accrued to HealthTran, LLC, Catamaran PBM of Colorado, LLC and OptumRx Discount Card Services, LLC were transferred to and are now owned by successor in interest, Plaintiff OptumRx.[3]  [*Id.*].

## B.    The Fraudulent Scheme

On December 10, 2013, Plaintiff executed a separate contract with United

---

[3] Both sides explicitly invoke the Assignment and Assumption Agreement as part of the corporate transactions and do not dispute its authenticity.  *See* [Doc. 97 at 14; Doc. 101 at 19–21; Doc. 105 at 7–9].  Therefore, the Court may consider the document without

Networks of America, Inc. ("UNA") ("UNA Agreement"). [*Id.* at ¶ 29]. UNA is a competitor of NBBI. [*Id.* at ¶¶ 27–31]. Like NBBI, UNA issues discount cards to consumers to purchase prescription drugs. [*Id.* at ¶ 27]. The UNA Agreement was conceptually similar to the NBBI Agreement, but Plaintiff and UNA negotiated a higher per-claim commission than the amount NBBI was earning under the NBBI Agreement and the 2012 Amendment. [*Id.* at ¶¶ 29, 32].

Unbeknownst to Plaintiff and no later than December 4, 2013, Defendants created a fraudulent scheme with three non-parties: UNA, Ryan Jumonville ("Mr. Jumonville"), and Robert Davies ("Mr. Davies"). [*Id.* at ¶¶ 27–31]. Mr. Jumonville is the owner of UNA and Mr. Davies is the Chief Legal Officer for UNA. [*Id.* at ¶ 28]. As part of the scheme, NBBI and UNA compared commission rates and decided to stage a non-existent acquisition of NBBI's discount card program by UNA. [*Id.* at ¶¶ 32, 34]. This fraudulent acquisition required Optum to process NBBI's claims with the higher per-claim commission rates in the UNA Agreement as opposed to the lower NBBI rates. [*Id.*]. Subsequently, NBBI and UNA would split the difference between the per claim commissions paid under the UNA Agreement as compared to the NBBI Agreement. [*Id.* at ¶ 33]. On December 18, 2013, Defendants informed Plaintiff that UNA had acquired NBBI's discount programs. [*Id.* at ¶ 42]. Defendants falsely represented this acquisition and the acquisition did not in fact occur. [*Id.* at ¶ 43]. Contemporaneously with the

---

converting the instant Motion for Partial Dismissal into one for summary judgment. *See GFF Corp. v. Associated Wholesale Grocers, Inc*., 130 F.3d 1381, 1384 (10th Cir. 1997) (observing that "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss").

scheme, NBBI produced, promoted, and distributed new discount cards containing UNA's fraudulent routing information. [*Id.* at ¶ 72]. NBBI sent these discount cards to its brokers in Colorado and nationwide, who distributed the cards to consumers. [*Id.* at ¶¶ 72–73]. Consumers used the new discount cards at pharmacies to obtain prescription drug discounts, pharmacies transmitted the claims to Plaintiff under the UNA commission rates, and Plaintiff paid those higher rates. [*Id.* at ¶ 72]. NBBI and UNA then split the difference between the per-claim commission amount in the NBBI Agreement and the UNA Agreement. [*Id.*]. At the same time, Defendants maintained control and ownership over NBBI's discount card programs. [*Id.* at ¶ 71].

Plaintiff requested documentation of the acquisition on July 16, 2014. [*Id.* at ¶ 53]. Later that month, an attorney for Defendants downloaded a template purchase agreement from a public website which eventually became a draft of the fraudulent acquisition agreement. [*Id.* at ¶¶ 58–58].Defendants subsequently prepared a fraudulent purchase of business agreement ("PBA") and backdated the signatures on the fraudulent document to make it appear as though the document was signed on December 17, 2013. [*Id.* at ¶¶ 54–55, 58–59]. In February 2015, Defendants and UNA redirected NBBI's business and UNA's business to a different provider of PBM services, despite NBBI's exclusive agreement with Plaintiff, thereby depriving Plaintiff of revenue for more than 1,000,000 NBBI claims. [*Id.* at ¶¶ 75–77].

Plaintiff contends that Defendants concealed the fraudulent scheme on several occasions, including via email, interstate wire, and other methods and in a parallel arbitration. [*Id.* at ¶¶ 78–84]. Plaintiff seeks monetary damages to compensate it for

losses during the fraudulent scheme.  [*Id.* at ¶ 86].

### C. NBBI's Counterclaim

In its Counterclaim, NBBI asserts that Optum manipulated its data to benefit from additional revenue.  [Doc. 107 at 18 ¶¶ 9–16].  The term "Usual and Customary Charge" in the NBBI Agreement is defined as "the price for a pharmaceutical a pharmacy in the Pharmacy Network would charge to a person that does not hold a Prescription Discount Card and does not participate in any type of plan or program whatsoever that provides coverage for pharmaceuticals."  [*Id.* at 18 ¶ 8].  Under the NBBI Agreement, a "Compensable Claim" was defined as "each purchase of pharmaceuticals by [NBBI's] clients utilizing [NBBI's] Prescription Discount Card from a pharmacy in the Pharmacy Network, when such purchase, taking into consideration any and all applicable fees, is less than the Usual and Customary Charge for which [Optum] is to provide Services described in this Agreement."  [*Id.* at 18 ¶ 7].  Optum agreed to pay a Compensable Claim Fee to NBBI for each Compensable Claim that Optum collected from Participating Pharmacies.  [*Id.* at 17 ¶ 6].

When Optum processed a claim from NBBI, it would receive industry standard data from the Participating Pharmacy on the claim transaction ("D.0 data").  [*Id.* at 18 ¶¶ 9–10].  D.0 data is typically used within the claims submission process for pharmacies and third-party claims.  [*Id.* 18 ¶ 10].  NBBI contends that Optum altered the D.0 data and created a different set of data ("Pharmacy Side data").  [*Id.* at 18 ¶¶ 11–12].  Optum then manipulated the Pharmacy Side data to create another set of data ("Client Side data").  [*Id.* at 19 ¶¶ 13–14].  On many occasions, Optum collected fees from Participating Pharmacies based on Compensable Claims submitted by NBBI, but using the Client Side

data, report the same claim as Usual and Customary to NBBI, thereby avoiding paying a Compensable Claim fee and pocketing the difference. [*Id.* at 19–20 ¶¶ 15–17]. In doing so, NBBI alleges that Optum violated its duty of good faith, breached the NBBI Agreement, and caused NBBI to lose millions of dollars in compensable claim fees. [*Id.* at 19 ¶ 16].

## II. Procedural Background

Catamaran PBM of Colorado ("Catamaran"), OptumRx, Inc., and UNA arbitrated a parallel dispute ("UNA Arbitration"), resulting in an October 5, 2023 arbitrator's award. *United Networks of Am., Inc. v. Catamaran PBM of Colo., LLC and Optum RX*, Final Award, Claim No. 3465, (October 5, 2023) (Risner, Arb.); [Doc. 79-1]. Many of the "Basic Questions" presented in the UNA Arbitration related to NBBI, and UNA's relationship with NBBI and the issues here, including but not limited to:

> If there was a valid Agreement between the Parties, did UNA validly purchase the business accounts (or some other assets) of NBBI, which would potentially be covered hy the terms of the Agreement allowing UNA to be paid for the accounts, or did UNA engage in a "Network Agreement" or some other arrangement that did not amount to a transaction that would bring the NBBI book of business under the Agreement and would not result in the conditions under which UNA may demand payment for the NBBI claims?

> If there was no valid Agreement between the Parties, did UNA interfere with Catamaran's customer NBBI, and improperly induce NBBI to move its book of business to another PBM, in violation of the contract in place between NBBI and [Optum]?

> If there was a valid Agreement between UNA and [Optum], and a valid purchase of the accounts/assets of NBBI by UNA, did [Optum] improperly refuse to pay [UNA][4] for the NBBI accounts?

---

[4] The Final Arbitration Award states: "[i]f there was a valid Agreement between UNA and Catamaran, and a valid purchase of the accounts/assets of NBBI by UNA, did Catamaran improperly refuse to pay <u>Catamaran</u> for the NBBI accounts?" [Doc. 79-1 at 17 ¶ 5 (emphasis added)]. Based on the surrounding context, the Court construes this second

> Did [Optum] engage in a practice of improperly "misclassifying" the "Commissionable Claims" as defined in the Agreement, as "Non-Commissionable Claims" and thus deprived UNA of revenue on such claims?
>
> Is [Optum] entitled to damages if there was no valid purchase of the NBBI, and [Optum] lost the benefit of the NBBI book of business as a result of UNA moving, or inducing NBBI to move, its book of business to another PBM?

[Doc. 79-1 at 17–18].  In the Final Arbitration Award, the Arbitrator concluded that UNA did not present sufficient evidence to establish that the NBBI claims should be processed under the UNA commission rates before the UNA Agreement was terminated by Catamaran.  [*Id.* at 27].  The Arbitrator further concluded, however, that before the NBBI claims were shifted to a different PBM, UNA did acquire NBBI's book of business and therefore Optum was not entitled to any damages for NBBI's claims shifting to another PBM.  [*Id.* at 29, 38].  With respect to whether Optum misclassified "Commissionable Claims," the Arbitrator could not "agree that the claims were misclassified, nor that UNA was due a commission if [Optum] made money (received 'payment' on the pharmacy contract) on the claims, unless it was specifically covered by the Agreement."[5]  [*Id.* at 37].

After the arbitration concluded, Plaintiff initiated this suit on November 15, 2023, [Doc. 1], and filed the operative First Amended Complaint ("Amended Complaint") on September 4, 2024, [Doc. 95].[6]  In the Amended Complaint, Optum asserts seven causes

---

reference to Catamaran as a typographical error that should instead be a reference to UNA.

[5] The Court takes judicial notice that the Final Arbitration Award is subject to judicial proceedings in the United States District Court for the Middle District of Florida, No. 23-cv-01308-TJC-PDB.  *See Bunn v. Perdue*, 966 F.3d 1094, 1096 n.4 (10th Cir. 2020) (recognizing that a court may take judicial notice of docket information from another court).

[6] On June 28, 2024, Plaintiff filed Plaintiff's Motion and Memorandum in Support for Limited Piercing of the Attorney-Client Privilege ("Motion to Pierce"), seeking access to

of action:  (1) fraud against all Defendants ("Count I"); (2) fraudulent concealment against all Defendants ("Count II"); (3) breach of contract against NBBI ("Count III"); (4) violations of the Civil Racketeer Influenced and Corrupt Organizations Act ("RICO") against all Defendants ("Count IV"); (5) conspiracy to commit violations of RICO against all Defendants ("Count V"); (6) breach of the duty of good faith and fair dealing against NBBI ("Count VI"); and (7) tortious interference with a contract against all Defendants ("Count VII").  *See* [*id.*].  On November 15, 2024, NBBI filed Defendant NBBI's Answer to Amended Complaint and Counterclaim ("Answer" or "Counterclaim") and asserted a single counterclaim against Optum for breach of contract.  [Doc. 107 at ¶¶ 21–27].

Defendants filed this Motion for Partial Dismissal on September 18, 2024, seeking dismissal of all the tort and RICO claims based on various theories.[7]  [Doc. 97].  Plaintiff brings its Motion to Dismiss Counterclaim pursuant to Fed. R. Civ. P. 12(b)(6).  [Doc. 108].  Both Motions are fully briefed.  [Doc. 101; Doc. 105; Doc. 114; Doc. 115].  On August 7, 2025, Plaintiff filed a Notice of Supplemental Authority.  [Doc. 122].  Thus, the instant

---

privileged documents ("Alpert File") under the crime-fraud exception.  [Doc. 74].  The Honorable N. Reid Neureiter granted the Motion to Pierce in part, to the extent that Judge Neureiter would conduct an in camera inspection of the disputed privileged documents. [Doc. 87].  On October 16, 2024, Judge Neureiter granted the Motion to Pierce in full, ordering that Defendants produce certain documents on the basis that there was probable cause to believe the documents demonstrated potential fraud regarding the alleged backdating of the PBA.  [Doc. 102].

[7] In the Motion to Dismiss, Defendants divide the causes of action into two groups, "tort claims" and "RICO claims." [Doc. 97 at 4; Doc. 95 at ¶¶ 87–151].  The Court follows Defendants' categorizations and uses "tort claims" to refer collectively to Count I for fraud; Count II for fraudulent concealment; and Count VII for tortious interference with a contract and "RICO claims" to refer to Count IV for civil RICO violations and Count V for conspiracy to commit RICO violations claims.  The last category of causes of action relates to Count III for breach of contract against NBBI and Count VI for breach of the duty of good faith and fair dealing against NBBI and this Court refers to them collectively as "contractual claims."

Motions are ripe for review.

## LEGAL STANDARDS

### I.      Rule 12(b)(1)

Under Rule 12(b)(1), a court may dismiss an action for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  A dismissal under Rule 12(b)(1) "is not a judgment on the merits of the plaintiff's claim" but rather "a determination that the court lacks authority to adjudicate the matter."  *Creek Red Nation, LLC v. Jeffco Midget Football Ass'n*, 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016).  "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking."  *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013) (quotation omitted).  The burden of establishing jurisdiction rests with the party asserting jurisdiction.  *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017).

### II.     Rule 12(b)(2)

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for lack of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  The plaintiff bears the burden of establishing a court's personal jurisdiction over a defendant.  *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069 (10th Cir. 2008).  When a court decides a Rule 12(b)(2) motion to dismiss without holding an evidentiary hearing, "the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion."  *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056–57 (10th Cir. 2008).  To establish jurisdiction, a plaintiff must demonstrate that (1) jurisdiction is proper under the forum state's long-arm statute and (2) the exercise of personal jurisdiction over

a defendant does not violate the Due Process Clause of the United States Constitution.

*Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1357 (10th Cir. 1990).  In Colorado, the long-

arm statute is coextensive with the Due Process Clause.  Colo. Rev. Stat. § 13-1-124(1).

"Therefore, if jurisdiction is consistent with the due process clause, Colorado's long arm

statute authorizes jurisdiction over a nonresident defendant."  *Benton v. Cameco Corp.*,

375 F.3d 1070, 1075 (10th Cir. 2004) (quotation omitted).

### III.    Rule 12(b)(6)

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss

a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P.

12(b)(6).  In deciding a motion under Rule 12(b)(6), courts must "accept as true all well-

pleaded factual allegations . . . and view these allegations in the light most favorable to

the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quotation

omitted).  The plaintiff bears the burden and may not rely on mere labels or conclusions,

because "a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).  In ruling on a motion

under Rule 12(b)(6), courts may also consider documents outside the four corners of the

pleadings if such documents are attached to the pleadings, they are central to the claims

in the case, and the parties do not dispute their authenticity.  *Alvarado v. KOB-TV, L.L.C.*,

493 F.3d 1210, 1215 (10th Cir. 2007).

### IV.    Rule 9(b)

Courts analyze the sufficiency of most claims under Rule 8(a) of the Federal Rules

of Civil Procedure, which requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, for fraud-based claims, plaintiffs must meet a higher pleading standard set forth in Rule 9(b), which provides "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

"The dismissal of a claim for failing to satisfy Rule 9(b) is treated as a dismissal under Rule 12(b)(6) for failure to state a claim upon which relief may be granted." *Brooks v. Bank of Boulder*, 911 F. Supp. 470, 473 (D. Colo. 1996). To survive a motion to dismiss under 9(b), a claim or counterclaim must set forth "the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Heavy Petroleum Partners, Inc. v. Atkins*, 457 F. App'x 735, 742–43 (10th Cir. 2012) (quotation omitted). While Rule 9(b) does permit pleadings based on "information and belief," a pleading that merely provides a formulaic recitation of the elements of a claim, without setting forth the particularized factual bases, does not satisfy Rule 9(b). *See zvelo v. SonicWall*, No. 06-cv-00445-PAB-KLM, 2013 WL 5443858, at *3 (D. Colo. Sept. 30, 2013). To satisfy Rule 9(b), a party must indicate who allegedly committed the fraud, what the fraud consisted of, and how and when the party allegedly committed the fraud. *United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc.*, No. 99-3105, 2000 WL 1595976, at *3 (10th Cir. Oct. 26, 2000).

## ANALYSIS

## I.    Defendants' Motion for Partial Dismissal

Defendants seek dismissal of Plaintiff's tort and RICO claims against all Defendants pursuant to Rules 12(b)(1) and 12(b)(6). [Doc. 97 at 3]. First, Defendants

assert that Plaintiff lacks standing to assert the tort and RICO claims against all Defendants. [*Id.* at 13–16]. Second, Defendants argue that all claims should be dismissed against the NBBI Executives because the Court lacks personal jurisdiction over them. [*Id.* at 16–22]. Third, Defendants seek dismissal of the tort claims against all Defendants under Colorado's economic loss rule, [*id.* at 5–9], and the dismissal of the tort claims against Mr. Faherty and Mr. Forester for failure to plead with the requisite particularity under Rule 9(b), [*id.* at 9–10]. Fourth and finally, Defendants seek dismissal of the RICO claims against all Defendants under Rule 9(b) because Plaintiff has failed to plead the predicate acts of fraud with the requisite particularity. [*Id.* at 10–13].

The Court addresses Defendants' arguments in turn, starting with the jurisdictional arguments.

## A.    Jurisdictional Arguments

Federal courts are courts of limited jurisdiction. "[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007); *see also Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 543 (10th Cir. 2016) (holding that subject matter jurisdiction cannot be assumed in order to proceed to the merits of a claim regardless of its significance).

### 1.    Standing

For a court to have subject-matter jurisdiction, a plaintiff must have standing. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000). Standing must be established for each claim separately. *DaimlerChrysler Corp. v. Cuno*,

547 U.S. 332, 352 (2006); *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007).

The standing inquiry has two components: constitutional and prudential. To establish

constitutional standing, a plaintiff must demonstrate "(1) an 'injury in fact,' (2) sufficient

'causal connection between the injury and the conduct complained of,' and (3) a

'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony*

*List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S.

555, 560–61 (1992) (alterations in original)). The elements of constitutional standing "are

not mere pleading requirements but rather an indispensable part of the plaintiff's case."

*Lujan*, 504 U.S. at 561.

A plaintiff must also satisfy the requirements of prudential standing. The

"prudential" branch of standing is not derived from Article III of the Constitution. *See*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). Rather,

prudential standing "embodies judicially self-imposed limits on the exercise of federal

jurisdiction." *Wilderness Soc. v. Kane Cnty.*, 632 F.3d 1162, 1168 (10th Cir. 2011)

(quotation omitted). To establish prudential standing, a plaintiff must (1) assert his own

rights, rather than those belonging to third parties; (2) demonstrate that his claim is not

simply a "generalized grievance"; and (3) show that plaintiff's grievance falls within the

zone of interests protected or regulated by statutes or constitutional guarantee invoked in

the suit. *Bd. of Cnty. Comm'rs of Sweetwater Cnty. v. Geringer*, 297 F.3d 1108, 1112 (10th

Cir. 2002) (citations omitted).

Defendants argue that "Optum was not the party to the NBBI Agreement and it was

not the party allegedly injured by the acts described in the First Amended Complaint."

[Doc. 97 at 13]. Specifically, Defendants contend that (1) Optum does not have standing

to pursue tort or RICO claims because a different entity—Optum Discount Card Services—was the party to the NBBI Agreement and the party injured by the acts in the Amended Complaint; and (2) the Assignment and Assumption Agreement only assigns contracts, not claims or causes of action. [*Id.*]. In response, Plaintiff contends that it assumed "all legal rights, obligations, and claims associated with the contracts at issue." [Doc. 101 at 19–21]. On Reply, Defendants insist that Plaintiff lacks standing to maintain its fraud and RICO claims pursuant to the Assignment and Assumption Agreement, and in any case, it may not recover for any injury that HealthTran sustained before the Assignment and Assumption Agreement was effective on June 23, 2022. [Doc. 105 at 7–9; Doc. 90-1].

*Framework.* It is not entirely clear whether the Parties are presenting this issue as one of constitutional standing, i.e., whether Plaintiff has suffered an injury-in-fact sufficient to assert its tort and RICO claims, or one of prudential standing, i.e., whether Plaintiff is asserting its own rights.[8] *See* [Doc. 97 at 13–14 & n.2 (Defendants invoking both Rule 12(b)(1) and 12(b)(6) as a basis for their standing arguments but referring to the standard for factual challenges to subject matter jurisdiction); Doc. 101 at 19 n.4 (invoking the standard for a facial, rather than a factual, challenge to constitutional standing)]. In some cases, the United States Court of Appeals for the Tenth Circuit ("Tenth

---

[8] There appears to be no dispute that Optum has constitutional and prudential standing to assert Counts III and Count VI for breach of contract and the breach of good faith and fair dealing respectively, against NBBI. *See* [Doc. 97 at 13–16; Doc. 105 at 7–9; Doc. 90-1 at 2]. Upon review, this Court independently concludes that Plaintiff has standing to assert such claims pursuant to the Assignment and Assumption Agreement's express provision that Plaintiff "shall assume all of Optum Rx Discount Card Services, LLC's obligations, rights, and liabilities under the Contracts as of the Effective Date," and identification of the NBBI Agreement. [Doc. 90-1 at 2, 3].

Circuit") has treated whether an assignee can recover for an injury suffered by the assignor as a matter of constitutional standing and subject matter jurisdiction. *See, e.g.*, *Dotson v. AWA Collections*, No. 22-6078, 2023 WL 3055574, at *2–3 (10th Cir. Apr. 24, 2023). But in other cases, the Tenth Circuit has treated the issue of whether an assignee can assert certain claims as an issue under Rule 17(a), which requires the real party in interest to be a party to the action (i.e., prudential standing). *See Brumfiel v. U.S. Bank*, 618 F. App'x 933, 936 (10th Cir. 2015) ("Fed. R. Civ. P. 17(a)(1), which provides that '[a]n action must be prosecuted in the name of the real party in interest,' essentially codifies this portion of the prudential standing doctrine." (quoting *RMA Ventures Cal. v. SunAmerica Life Ins. Co.*, 576 F.3d 1070, 1073 (10th Cir. 2009))); *K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1154 n.7 (10th Cir. 1985) ("Defendants also contend that [Plaintiff] lacked standing to bring the fraudulent misrepresentation claim. We believe, however, that the standing challenge is not properly raised in connection with real party in interest analysis under Rule 17(a)."). This is also consistent with the arguments made by Defendants in response to Plaintiff's Motion to Amend, where Defendants expressly invoked the doctrine of prudential standing. [Doc. 72 at 9–11].[9] Prudential standing does not implicate this Court's subject matter jurisdiction. *See Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 90 (2005); *see also Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) (observing when "a case turns on the validity of an assignment

---

[9] In the context of Defendants' opposition to Plaintiff's Motion to Amend, this Court declined to decide this issue as "the most efficient and appropriate course of action [was] for Defendants to re-assert any arguments for dismissal of Plaintiff's RICO claims—along with any other argument aimed at the Amended Complaint, including but not limited to personal jurisdiction challenges as to the individual Defendants—in a subsequent motion to dismiss." [Doc. 94 at 8–9].

of contractual rights, that is not a question of Article III standing but one of contractual standing") (quotation omitted); *Novartis Seeds, Inc. v. Monsanto Co.*, 190 F.3d 868, 869 (8th Cir. 1999) ("[W]hether an assignment or transfer in violation of the . . . [a]greement took place has nothing to do with subject-matter jurisdiction, but rather with an arguable defense on the merits."); *Toretto v. Donnelley Fin. Sols., Inc.*, 523 F. Supp. 3d 464, 476 (S.D.N.Y. 2021) ("[B]y challenging the sufficiency of the allegations to plead a cause of action for breach of contract in the context of a Rule 12(b)(1) challenge to [p]laintiffs' standing, Defendants again tempt the [c]ourt to conflate a merits inquiry with standing.").

Because the dispute is whether Plaintiff (or one of its subsidiaries) is the appropriate entity to bring this action, and not whether there has been a harm to be remedied, this Court finds that the prudential standing doctrine provides the appropriate framework. As a result, the Court's subject matter jurisdiction is not implicated, and this Court proceeds pursuant to Rule 12(b)(6). While this Court agrees with Defendants that the Assignment and Assumption Agreement alone does not convey to Optum the right to assert any non-contractual claims on behalf of HealthTran and/or Optum Discount Card Services, Plaintiff also alleges that:

> In November 2014, as a result of several corporate mergers and transactions, HealthTran, LLC changed its name to Catamaran PBM of Colorado, LLC and then to OptumRx Discount Card Services, LLC. Through a series of corporate transactions, that company no longer exists and the legal claims set forth herein which accrued to HealthTran, LLC, Catamaran PBM of Colorado, LLC and OptumRx Discount Card Services, LLC were transferred to and are now owned by successor in interest, Plaintiff OptumRx.

[Doc. 95 at ¶ 10 (emphasis added)]. Accepting all material factual allegations and construing them in favor of Plaintiff, this Court concludes that Optum has adequately alleged that it is asserting its own rights in tort and under RICO to satisfy prudential

standing at this early stage. *See Paoloni v. Goldstein*, 200 F.R.D. 644, 646 (D. Colo. 2001). Accordingly, this Court respectfully **DENIES in part** Defendants' Motion for Partial Dismissal insofar as it seeks to dismiss Plaintiff's tort and RICO claims for lack of standing.

### 2. Personal Jurisdiction

Personal jurisdiction is "an essential element of the jurisdiction of a district court," and without it, "the court is 'powerless to proceed to an adjudication.'" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (quoting *Emps. Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937)). Where the state long arm statute "supports personal jurisdiction to the full extent constitutionally permitted," as it does in Colorado, "due process principles govern the inquiry." *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011). In order to exercise specific personal jurisdiction without violating due process, a defendant "must have minimum contacts with the forum state, such that having to defend a lawsuit there would not offend traditional notions of fair play and substantial justice." *Id.* (cleaned up); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). A court has specific jurisdiction over a defendant if (1) the defendant purposefully directs its activities to residents of the forum, and (2) the cause of action arises out of those activities. *See Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1066 (10th Cir. 2007).

Defendants argue that the Court should dismiss all claims against the NBBI Executives under Rule 12(b)(2) because Plaintiff has failed to meet its burden of establishing the Court's personal jurisdiction over the NBBI Executives. [Doc. 97 at 16–22]. Specifically, Defendants argue that the NBBI Executives are not subject to specific personal jurisdiction in Colorado because Plaintiff has not alleged that the NBBI

Executives purposefully directed their activities to Colorado nor that Optum's alleged injuries arise out of those activities.[10]  [*Id.* at 16–19].  Further, Defendants argue that the RICO claims "do not cure the lack of personal jurisdiction" because Plaintiff did not allege a separate basis for personal jurisdiction under RICO; Plaintiff's RICO claims fail to state a claim; and Plaintiff has not alleged or shown that the "'ends of justice' require an extension of personal jurisdiction."  [*Id.* at 21–22 (quoting 18 U.S.C. § 1965(b))].  Plaintiff contends that the Court has specific personal jurisdiction over the NBBI Executives based on minimum contacts with Colorado and the closely related doctrine.  [Doc. 101 at 21–25].  Because the Parties have advanced claim-specific arguments regarding specific personal jurisdiction, *see, e.g.*, [Doc. 97 at 21–22 (discussing personal jurisdiction for Plaintiff's RICO claims separately)], the Court analyzes its exercise of personal jurisdiction over the NBBI Executives with respect to Plaintiff's tort and RICO claims separately.  *See Grynberg v. Ivanhoe Energy, Inc.*, 490 F. App'x 86, 92 n.4 (10th Cir. 2012) (observing that "[s]everal circuits have taken the view that the determination of specific personal jurisdiction is a claim-specific inquiry," such that  "a conclusion that the court has personal jurisdiction over one defendant as to a particular claim does not necessarily mean that the court has personal jurisdiction over that same defendant as to other claims by the same plaintiff," but declining to do so where the parties did not

---

[10] The Court's analysis is limited to specific jurisdiction as the Parties do not dispute that the Court lacks general jurisdiction over the NBBI Executives.  [Doc. 97 at 16; Doc. 101 at 21].

advance claim-specific arguments) (quotation omitted).

### a.    Tort Claims

***Minimum Contacts.***  Jurisdiction over a corporation itself does not automatically confer jurisdiction over the corporation's employees or officers.  *See Calder v. Jones*, 465 U.S. 783, 790 (1984) ("Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there.").  A court must consider the allegations of corporate officers' "personal acts as individuals" to determine whether it may exercise personal jurisdiction.  *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1102–03 (10th Cir. 2009); *Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1020 (10th Cir. 1990) ("Minimum contacts must be found as to each defendant over whom the court exercises jurisdiction.").  The minimum contacts standard "requires, first, that the out-of-state defendant must have 'purposefully directed' its activities at residents of the forum state, and second, that the plaintiff's injuries must 'arise out of' the defendant's forum-related activities."  *Dudnikov*, 514 F.3d at 1071 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

In cases alleging "business torts committed by an out-of-state defendant," the Tenth Circuit applies "the *Calder* 'effects' test."  *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 966 n.9 (10th Cir. 2022).  The *Calder* effects test analyzes whether an out-of-state defendant's tortious conduct satisfies three elements:   "(1) an intentional action; (2) expressly aimed at the forum state; . . . (3) with knowledge that the brunt of the injury would be felt in the forum state."  *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1231 (10th Cir. 2020); *Newsome v. Gallacher*, 722 F.3d 1257, 1264–65 (10th Cir. 2013).  *Calder* asks whether the effects of the defendant's tortious conduct connect

him to the *forum* and "not just to the plaintiff." *Walden v. Fiore*, 571 U.S. 277, 287–288 (2014). In the Tenth Circuit, if a plaintiff can make a prima facie showing that a defendant purposefully directed his tortious conduct at the forum state, that direction can establish minimum contacts. *Eighteen Seventy, LP*, 32 F.4th at 968. Defendants' arguments challenge the second element of the *Calder* test, i.e., whether the NBBI Executives expressly aimed their activities at Colorado. [Doc. 97 at 16–18].

**Expressly Aimed at Colorado.** Regarding the second *Calder* factor, whether the NBBI Executives "expressly aimed" their conduct at Colorado, Optum argues that "Defendants specifically targeted Colorado markets with prescription discount coupon cards bearing fraudulent routing information," thereby targeting both Colorado brokers and Colorado drug consumers. [Doc. 101 at 22–24]. However, Plaintiff fails to allege that Mr. Marszalowicz, Mr. Faherty, or Mr. Forester specifically targeted Colorado with their individual tortious conduct. Indeed, its argument with respect to personal jurisdiction fails to specifically identify a single factual allegation in the Amended Complaint, but rather generally refers to "Defendants' actions in furtherance of the fraud, breaches of contract, and tortious interference with UNA's contract contributing to Plaintiff's damages" and different sections of its Brief. [*Id.* at 23–24].

As an initial matter, this Court respectfully declines to craft arguments on behalf of Plaintiff, particularly given the fact that it has been ably represented by counsel since the inception of the lawsuit. *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that a court has no obligation to make arguments or perform research on behalf of litigants); *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for

himself."). Plaintiff generally alleges that the NBBI Executives knew of the provisions of the NBBI Agreement and committed acts inextricably linked to it, [Doc. 95 at ¶ 16]; decided to enter into it, [*id.* at ¶ 26]; developed a scheme with UNA to defraud Plaintiff, [*id.* at ¶¶ 31–32]; failed to fulfill a legal duty to disclose the scheme, [*id.* at ¶ 35]; and "authorized the sending of an email . . . to Plaintiff's representative(s) located in Colorado reiterating Defendants' false representation that UNA had 'acquired' NBBI's discount card programs," [*id.* at ¶ 42]. Further, the allegations regarding the distribution of new discount cards, filling and paying for prescriptions in Colorado, and marketing NBBI's "America's Drug Card" across the country, "including in Colorado," are all directed generally at "Defendants," without any distinction as to the individual NBBI Executives. *See, e.g.*, [*id.* at ¶¶ 72–73]. Such allegations, even when taken as true, cannot be described as "intentional actions that were expressly aimed at [Colorado]" by the individual NBBI Executives. *Dudnikov*, 514 F.3d at 1077. The allegations that are focused on the particular actions of these individual NBBI Executives, *see, e.g.*, [Doc. 95 at ¶¶ 30, 38, 45, 54, 60, 62], do not factually allege any nexus to Colorado. The Court respectfully concludes that Optum has failed to carry its burden of making a prima facie showing that the NBBI Executives expressly or purposefully directed their tortious actions to Colorado, and plaintiff's allegations thus do not satisfy the second *Calder* prong. *See Newsome*, 722 F.3d at 1268; *Anzures v. Flagship Rest. Grp.*, 819 F.3d 1277, 1282 (10th Cir. 2016) (concluding, in a fraud and misrepresentation case, that the court's exercise of personal jurisdiction was not proper where defendants never targeted Colorado specifically); *Motto Franchising, LLC v. UMortgage LLC*, No. 23-cv-00609-RM-SBP, 2024 WL 1509178, at *6 (D. Colo. Feb. 16, 2024) (finding that the plaintiff did not make a prima facie showing on

the second *Calder* factor when a defendant sent a check to Colorado, issued an internet press release that did not mention Colorado residents or businesses, and was a nationwide company with franchise across the country, even though the defendant knew the plaintiff was headquartered in Colorado), *report and recommendation adopted*, 2024 WL 1508824 (D. Colo. Mar. 6, 2024); *cf. Dudnikov*, 514 F.3d at 1082 (concluding that the exercise of personal jurisdiction was proper because defendants acted expressly to halt an auction in Colorado).

The *Calder* inquiry stops if a plaintiff fails to demonstrate purposeful direction. *Eighteen Seventy, LP*, 32 F.4th at 968 ("Not uncommonly, our decisions have ended the *Calder* effects analysis after holding that the plaintiffs have failed to meet the second, express aiming, element of the test.") (collecting cases). Therefore, the Court turns to whether it may exercise personal jurisdiction over the NBBI Executives based on the closely related doctrine.

**Closely Related Doctrine.** Plaintiff contends that the Court has specific personal jurisdiction over the NBBI Executives because they are sufficiently closely related to the dispute under the NBBI Agreement such that the forum selection clause should apply to them. [Doc. 101 at 24–25]. The forum selection clause states that "The [P]arties hereby consent and submit to the exclusive jurisdiction of the courts within the State of Colorado in any action or proceeding instituted under this Agreement." [Doc. 1-1 at 7 § 5(g)]. In Plaintiff's view, the forum selection clause is sufficient to create personal jurisdiction over the NBBI Executives because the NBBI Executives were "senior executives and owners of NBBI, personally benefited from the NBBI Agreement, and knew of the [NBBI] [A]greement's provisions and forum selection clause." [Doc. 101 at 25]; *see* [Doc. 95 at

¶ 16].  Defendants disagree.  Defendants contend that the NBBI Executives cannot be subject to the forum selection clause as non-signatories because the Tenth Circuit has not adopted the closely related doctrine.  [Doc. 97 at 19–21].  Plaintiff acknowledges that it brings its tort claims in this Court "for the express purpose of extending or modifying existing law related to the recognition of the 'closely related doctrine' in Colorado."[11]  [Doc. 95 at ¶ 16].

Forum selection clauses should be enforced against signatories "in all but the most exceptional cases," *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013) (quotation omitted), but a party generally cannot be bound by a contract it did not sign, *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).  However, courts have adopted the closely related doctrine to conclude that "[n]on-signatories to a contract are subject to its valid forum selection clause if they, or the claims they bring, are 'closely related to the contractual relationship.'" *PFC Payment Sols., LLC v. Element Payment Servs., Inc.*, No. 12-cv-01472-CMA-MJW, 2012 WL 3264305, at *3

---

[11] Specifically, Plaintiff states:  "[p]ursuant to Colo. Rev. Stat. § 13-17-201, . . . [Plaintiff] brings its tort claims, including all claims against [Mr.] Marszalowicz, [Mr.] Faherty, and [Mr.] Forester, in this Court for the express purpose of extending or modifying the recognition of the closely related doctrine so as to prevent duplicative litigation wherein Plaintiff is forced to litigate against NBBI in Colorado and against the [NBBI Executives] in one or more other jurisdictions."  [Doc. 95 at ¶ 16].  Section 13-17-201(2) provides that subsection one does not apply to any "good faith, non-frivolous claim filed for the express purpose" of extending a particular doctrine and that subsection two "applies so long as the party that brought the dismissed claim has pleaded, in its complaint, counterclaim, or cross claim, that the dismissed claim was made for one of the express purposes stated in this subsection (2) and identified the precedent, law, or regulation the party seeks to extend, limit, modify, or reverse, or whether the issue to be decided is a matter of first impression."  "Although the statute is expressly applicable when dismissal is pursuant to the Colorado state rule, it has been construed to apply equally when dismissal is under the analogous federal rule."  *Silver v. Primero Reorganized Sch. Dist. No. 2*, No. 06-cv-02088-MSK-BNB, 2008 WL 280847, at *1 (D. Colo. Jan. 30, 2008).

(D. Colo. Aug. 10, 2012) (quoting *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988)).  Although other circuits have adopted the doctrine,[12] the Tenth Circuit has not passed on the closely related doctrine.  Some courts within the Tenth Circuit have analyzed the closely related doctrine and bound non-signatories to an agreement based on the non-signatories' relationship to the agreement.  *See, e.g.*, *Am. Maplan Corp. v. Hebei Quanen High-Tech Piping Co.*, No. 17-cv-01075-JTM, 2017 WL 5598262, at *13–15 (D. Kan. Nov. 21, 2017) (applying a forum selection clause to an affiliate and its executive officers who were "highly involved in the transaction" and stating that a non-signatory can be bound "by a forum selection clause" if "the enforcement of the forum selection clause against the non-party [was] foreseeable prior to suit" (quotation omitted)); *Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, No. 20-cv-02757-DDD-STV, 2020 WL 6119470, at *4 (D. Colo. Oct. 16, 2020) (concluding that forum selection clauses in several franchise agreements applied to non-signatory defendants).

While this Court might be persuaded to extend the closely related doctrine to the contract claims, the forum selection clause expressly only applies to an action or proceeding instituted under the NBBI Agreement.  [Doc. 1-1 at 7 § 5(g)].  Plaintiff cites no authority to allow this Court to extend the forum selection clause to Optum's tort and RICO claims that do not arise under the NBBI Agreement (as discussed in detail below), and this Court respectfully declines to adopt, in the first instance, a doctrine that appears

---

[12] The Second, Seventh, Eighth, Ninth, and Eleventh Circuits have adopted differing forms of the doctrine.  *See, e.g.*, *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013); *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 208 (7th Cir. 1993); *Marano Enters. of Kan. v. Z-Teca Rest., L.P.*, 254 F.3d 753, 757 (8th Cir. 2001); *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998).

inapposite to the specific claims at issue and for which there is no binding authority. *Lee v. Heredia-Gallegos*, No. 23-cv-01184-RMR-STV, 2023 WL 6904542, at *3 (D. Colo. Sept. 7, 2023) ("[I]t is beyond the purview of this Court to adopt new doctrines regarding jurisdiction."), *report and recommendation adopted*, 2023 WL 7089903 (D. Colo. Oct. 26, 2023).    Accordingly, the Court finds that it lacks personal jurisdiction over the NBBI Executives for Plaintiff's tort claims.

**b.    RICO Claims**

The Court next turns to whether it has personal jurisdiction over the NBBI Executives for Plaintiff's RICO claims. "When a civil RICO action is brought in a district court where personal jurisdiction can be established over at least one defendant, summonses can be served nationwide on other defendants if required by the ends of justice." *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006) (citing 18 U.S.C. § 1965(a) and (b)). Here, Defendants have not challenged the Court's exercise of personal jurisdiction over NBBI with respect to Plaintiff's RICO claims.[13] Because the Court has personal jurisdiction over NBBI, it follows that the Court may then exercise personal jurisdiction over the NBBI Executives for the RICO claims so long as exercising that jurisdiction is required by the ends of justice and otherwise comports with due process. *See id.* "The 'ends of justice' is a flexible concept uniquely tailored to the facts of each case" that courts interpret liberally. *Id.* at 1232; *see also Greenway Nutrients, Inc.*

---

[13] Defendants challenge the use of the forum selection clause to establish jurisdiction over the NBBI Executives with respect to Plaintiff's tort claims, but not Plaintiff's RICO claims. [Doc. 97 at 19 ("Optum can't rely on the NBBI Agreement's forum-selection clause to establish jurisdiction because that clause has no bearing on the NBBI Executives or Optum's tort claims.")]. Defendants make no parallel argument regarding the Court's exercise of personal jurisdiction over NBBI based on the forum-selection clause for Plaintiff's RICO claims. *See generally* [*id.*].

*v. Blackburn*, 33 F. Supp. 3d 1224, 1248 (D. Colo. 2014) (explaining that "the Tenth Circuit has not provided a bright line rule for the 'ends of justice' analysis").[14]

Defendants rais the ends of justice issue in the Motion for Partial Dismissal, stating that Plaintiff has not "alleged, let alone shown, that 'the ends of justice' require an extension of personal jurisdiction." [Doc. 97 at 22]. Despite this, Plaintiff does not address specific personal jurisdiction as to RICO claims or the ends of justice. *See generally* [Doc. 95; Doc. 101]. Without argument regarding the ends of justice, a plaintiff cannot meet the ends of justice standard. *Hart v. Salois*, 605 F. App'x 694, 699 (10th Cir. 2015) ("[The plaintiff] neither points to any facts alleged in his Complaint nor advances any contention . . . supporting his conclusion that the ends of justice require nationwide service of process in this case."); *Goode v. Gaia, Inc.*, No. 20-cv-00742-DDD-KLM, 2021 WL 9793708, at *6 (D. Colo. July 16, 2021) ("Plaintiffs have failed to provide, or even mention, an 'ends of justice' analysis or why jurisdiction is proper under the statute."), *report and recommendation adopted sub nom. Goode v. High*, 2021 WL 9793662 (D. Colo. Aug. 12, 2021). Plaintiff alleges litigation cost in the forum, but a plaintiff's "mere assertion that he 'has sustained damages and litigation costs' in the forum is not enough to justify nationwide service of process under RICO." *List Interactive, Ltd. v. Knights of Columbus*, No. 17-cv-00210-RBJ, 2017 WL 3217817, at *8 (D. Colo. July 28, 2017) (quoting *Cory*, 458 F.3d at 1232).

---

[14] Defendants first argue that the Court cannot exercise personal jurisdiction over the NBBI Executives because Plaintiff's RICO claims fail under Rule 12(b)(6). [Doc. 97 at 22]. However, a court may not proceed to the merits of a claim if it lacks personal jurisdiction over the defendants against whom the claim is stated. *Ruhrgas AG*, 526 U.S. at 584.

Although only a prima facie showing is required at this stage, *id.* at *5, the Court respectfully concludes that Plaintiff has failed to carry its burden to make a prima facie showing of jurisdiction under RICO.  *Goodwin v. Bruggeman-Hatch*, No. 13-cv-02973-REB-MEH, 2014 WL 3882183, at *7 (D. Colo. Aug. 7, 2014) (concluding that the plaintiff failed to meet the ends of justice standard because the plaintiff "offer[ed] nothing but the conclusory statement that . . . the 'ends of justice' require nationwide personal jurisdiction").    Accordingly, Defendants' Motion for Partial Dismissal is respectfully **GRANTED in part** to the extent it seeks dismissal of Counts I, II, IV, V, and VII without prejudice against Defendants Marszalowicz, Faherty, and Forester for lack of personal jurisdiction.  The Court analyzes the remaining issues only as to NBBI.

### B.    The Sufficiency of Plaintiff's Allegations

### 1.    Tort Claims:  Economic Loss Rule

Defendants next ask the Court to dismiss the tort claims pursuant to Rule 12(b)(6) under Colorado's economic loss rule.[15]  [Doc. 97 at 5–9].  Defendants argue that Optum's tort claims are based on conduct that occurred after the execution of the NBBI Agreement and that therefore Plaintiff must establish a tort duty independent from the contractual duty and Plaintiff has failed to do so.  [*Id.* at 5–7].  Plaintiff contends that the economic loss rule is inapplicable to its tort claims because Colorado's economic loss rule does not apply to intentional torts.  [Doc. 101 at 12–15].

Colorado's economic loss rule states that "a party suffering only economic loss

---

[15] Because neither Party disputes the application of Colorado law, the Court assumes that Colorado law applies here.  *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Mid-Century Ins. Co. v. HIVE Constr., Inc.*, 567 P.3d 153, 158 (Colo. 2025) (quotation omitted). Colorado courts consider the duty at the foundation of the action to determine whether the economic loss rule applies. *Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000). "A contract duty arises from promises made between the parties, either implied or in the form of express warranties," whereas a "tort duty is imposed by law to protect citizens from the risk of physical harm to their persons or property, without regard to an agreement or contract." *Wolfe v. City of Colo. Springs*, No. 22CA0443, 2023 WL 12058367, at *3 (Colo. App. Apr. 6, 2023).

Historically, Colorado courts applied the economic loss rule to bar intentional tort claims, such as claims for fraud. *See, e.g.*, *Top Rail Ranch Ests., LLC v. Walker*, 327 P.3d 321, 329 (Colo. App. 2014) (applying the economic loss rule to bar a fraudulent concealment claim, among others); *Former TCHR, LLC v. First Hand Mgmt. LLC*, 317 P.3d 1226, 1231, 1233 (Colo. App. 2012) (barring a fraudulent concealment claim under the economic loss rule); *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 289 (Colo. App. 2009) (barring a fraudulent concealment claim under the economic loss rule). However, since those decisions, the Colorado Supreme Court has clarified the application of the economic loss rule. *See Bermel v. BlueRadios, Inc.*, 440 P.3d 1150, 1153, 1154 n.6 (Colo. 2019).

In *Bermel*, the Colorado Supreme Court specifically stated that "the economic loss rule generally should not be available to shield intentional tortfeasors from liability for

misconduct that happens also to breach a contractual obligation."[16]   *Id.*    Therefore, although courts historically have applied the economic loss rule more broadly, the Colorado Supreme Court's "*Bermel* decision constitute[d] an intervening change in controlling law" that altered how Colorado courts look at the economic loss rule. *McWhinney Holding Co., LLLP v. Poag*, No. 17-cv-02853-RBJ, 2019 WL 9467529, at *3 (D. Colo. Dec. 9, 2019) (granting the plaintiffs' motion to reconsider the court's order concluding that the economic loss rule barred the plaintiffs' fraudulent concealment, misrepresentation, and civil conspiracy claims after *Bermel*); *see also Vyanet Operating Grp., Inc. v. Maurice*, No. 21-cv-02085-CMA-SKC, 2022 WL 4008043, at *4 (D. Colo. Sept. 2, 2022) (discussing the economic loss rule after *Bermel* and declining to dismiss plaintiff's claims for fraud and fraudulent concealment based on the economic loss rule and collecting cases).

Since *Bermel*, Colorado courts and courts in this District applying Colorado law have generally declined to apply the economic loss rule to intentional torts because an intentional tort contains an inherent independent duty not to intentionally harm others. *McWhinney Holding Co.*, 2019 WL 9467529, at *2; *see, e.g.*, *W. State Bank v. Cosey, L.L.C.*, No. 19-cv-01155-JLK, 2019 WL 5694271, at *4 (D. Colo. Nov. 4, 2019) (concluding that the economic loss rule would not bar plaintiff's fraud claim because the claim alleges an intentional tort); *see also Mid-Century Ins. Co.*, 567 P.3d at 158 ("[T]he

---

[16] In *Bermel,* the discussion of the economic loss rule and intentional torts is located in a footnote; however, courts in this District have stated that it nevertheless "alter[s] the application of the economic loss rule under Colorado law." *McWhinney Holding Co., LLLP v. Poag*, No. 17-cv-02853-RBJ, 2019 WL 9467529, at *3 (D. Colo. Dec. 6, 2019).  This Court concludes similarly and finds that it must consider the language in the footnote even if it is considered dicta.  *See City of Fort Collins v. Open Int'l, LLC*, No. 24-1152, 2025 WL 2057738, at *4 n.5 (10th Cir. July 23, 2025).

economic loss rule generally should not apply to intentional tort claims." (emphasis omitted)); *McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Centers-Centerra LLC*, 80, 486 P.3d 439, 453 (Colo. App. 2021) (holding that intentional tort claims stemmed from tort law duties independent of the contract and the economic loss rule did not apply).

Even before *Bermel*, in *Alma*, the Colorado Supreme Court stated that "certain common law claims that sound in tort and are expressly designed to remedy economic loss may exist independent of a breach of contract claim." *Alma*, 10 P.3d at 1263. The Colorado Supreme Court went on to conclude that when there is an independent duty in tort, "the economic loss rule has no application and does not bar a plaintiff's tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule." *Id.* Similarly, even before *Bermel*, the Tenth Circuit stated that the economic loss rule "applies only to tort claims based on negligence." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1226 (10th Cir. 2000). Defendants do not cite *Bermel* or *Alma*, nor do they explain how either case can be read to shield intentional tortfeasors from liability using the economic loss rule.[17] *See generally*

---

[17] This Court is troubled by the fact that NBBI did not cite *Bermel*. Under Rule 11 of the Federal Rules of Civil Procedure, by presenting the Motion for Partial Dismissal to the Court, Plaintiff and its counsel was certifying that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Rule 3.3 of the Colorado Rules of Professional Conduct provides that a lawyer shall not knowingly "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel." Colo. RPC 3.3(a)(2). Defendants' counsel of record are Colorado attorneys, and aside from limited exceptions not at issue here, the District of Colorado has expressly adopted the Colorado Rules of Professional Conduct as its standards of professional responsibility. D.C.COLOLAttyR 2.

[Doc. 97].  Plaintiff brings three tort claims:  fraud (Count I), fraudulent concealment (Count II), and tortious interference with a contract (Count VII).  [Doc. 95 at ¶¶ 87–109]. Each is an intentional tort.  *See Ebrahimi v. E.F. Hutton & Co.*, 794 P.2d 1015, 1017 (Colo. App. 1989) (fraud); *InnoMax Corp. v. Fry*, No. 19CA0403, 2020 WL 14046164, at *6 (Colo. App. June 11, 2020) (fraudulent concealment); *Bolsa Res., Inc. v. Martin Res., Inc.*, No. 11-cv-01293-MSK-KMT, 2014 WL 4882132, at *9 (D. Colo. Aug. 28, 2014) (tortious interference with a contract).  Each is associated with a common law duty of care independent of contractual obligations in the NBBI Agreement.  *McWhinney*, 486 P.3d at 455.  Under *Bermel* and Colorado case law, the economic loss rule does not bar them because they contain a duty that is inherently independent from the duty created by the NBBI Agreement.  *Mid-Century Ins. Co.*, 567 P.3d at 156–57.

This Court finds the authority Defendants cite for the proposition that Plaintiff's tort and contract duties are the same, *Dream Finders Homes LLC v. Weyerhaeuser NR Co.*, 506 P.3d 108 (Colo. App. 2021), unpersuasive.  [Doc. 97 at 5–6, 8].  In *Dream Finders*, the court concluded that post-contractual claims for misrepresentation were barred by the economic loss rule because any duty that the defendants had not to make misrepresentations before making the contract "was subsumed within the contract through the implied duty of good faith and fair dealing."  *Dream Finders*, 506 P.3d at 123. However, despite citing *Bermel*, the court in *Dream Finders* relies upon several pre-*Bermel* decisions for its conclusions.  *Id.* (citing *Hamon Contractors*, 229 P.3d at 292–93; *Top Rail*, 327 P.3d at 329; and *Former TCHR, LLC*, 317 P.3d at 1231).  Therefore, *Dream*

*Finders* appears to be an outlier in the post-*Bermel* application of the economic loss rule.

Accordingly, the Motion for Partial Dismissal is **DENIED in part** to the extent it seeks dismissal of Plaintiff's tort claims against NBBI under Rule 12(b)(6) and the economic loss rule.[18]

### 2.    RICO Claims:  Rule 9(b)

In order to state a claim under RICO, Optum must allege:  "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010) (quotation omitted); *Ambraziunas v. Bank of Boulder*, 846 F. Supp. 1459, 1462–63 (D. Colo. 1994).  "A pattern of racketeering activity must include at least two predicate acts." *Gillmor v. Thomas*, 490 F.3d 791, 797 (10th Cir. 2007) (quotation omitted).  Optum must plead sufficient facts to show that Defendants "committed racketeering predicate offenses which are related and amount to or pose a threat of continued criminal activity."  *Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1477–78 (D. Colo. 1995) (citing *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).  Courts have interpreted a pattern to require both a relationship between predicate acts and a threat of continued racketeering activity.  *Johnson v. Heath*, 56 F.4th 851, 858 (10th Cir. 2022).

Requiring plaintiffs to plead with particularity under RICO "give[s] the defendant, and the trial court, clear notice of the factual basis of the predicate acts" underlying the alleged RICO violations.  *Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357,

---

[18] On Reply, Defendants argue for the first time that Plaintiff cannot maintain tort claims for any time before it had any contractual rights.  [Doc. 105 at 7–8].  Because this argument was first raised on Reply, this Court declines to consider it.  *See Kerber v. Qwest Grp. Life Ins. Plan*, 727 F. Supp. 2d 1076, 1079 (D. Colo. 2010).

1362 (10th Cir. 1989). The Tenth Circuit has held that "Rule 9(b) requires particularity in pleading RICO mail and wire fraud." *Id.* However, "[a] claim should not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that plaintiff can prove no set of facts which would entitle him or her to relief." *Brooks*, 891 F. Supp. at 1476.

Defendants argue the Court should dismiss Plaintiff's RICO claims because Plaintiff has failed to plead facts that meet the required elements. [Doc. 97 at 10–13]. Specifically, Defendants argue that Optum's averments are entirely conclusory, including but not limited to "there is no continuous pattern of activity actually alleged here: all of the alleged predicate acts relate to a *single* allegedly postdated agreement." [*Id.* at 12–13]. Plaintiff responds that it has "pleaded its RICO claims with requisite particularity." [Doc. 101 at 17]. It points to the allegations supporting its theory that Defendants concocted a false "proposed story" that UNA had "acquired" NBBI's discount card programs that then permeated through Defendants' action from 2013 to the present action. [*Id.* at 18]. The Amended Complaint alleges the RICO predicate acts to be wire fraud, [Doc. 95 at ¶¶ 30–31, 33, 39, 42, 62–63, 72, 78–85, 123–127], and mail fraud, [*id.* at ¶¶ 59–60, 123–125, 127].

### a.    Section 1962(c) Claims

Even assuming that Optum has sufficiently alleged other elements, this Court respectfully concludes that Plaintiff has not adequately alleged facts that amount to or pose a threat of continued criminal activity. Continuity can be "closed or open ended" and depends "on the specific facts of each case." *Johnson*, 56 F.4th at 859 (quoting *H.J. Inc.*, 492 U.S. at 241–42). "Closed-ended continuity is a closed period of repeated racketeering conduct, while open-ended continuity consists of racketeering conduct that

threatens future repetition." *Id.*  A "party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J., Inc.*, 492 U.S. at 242.  Courts consider the extensiveness of the racketeering scheme and the substantiality of the period of time over which it allegedly occurred. *Johnson*, 56 F.4th at 861.  A single scheme may establish a pattern, but "it will not suffice if there is no indication of a threat of continuing illegal activity." *Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1304–05 (D. Colo. 1998).  But Optum does not specifically address either theory of continuity in its Opposition. *See* [Doc. 101 at 17–19].

Plaintiff pleads that "Defendants have committed ten or more acts of racketeering activity within a decade that were continuous and interrelated."  [Doc. 95 at ¶ 123].  Plaintiff alleges that the fraudulent scheme began in 2013 when Defendants "negotiat[ed] a secret fraudulent deal with UNA," [*id.* at ¶ 126]; continued in 2014, when Defendants "backdated the 'Purchase of Business Agreement' . . . transmitted a fraudulent letter to Plaintiff, and used UNA's routing information to obtain overpayments" on discount card claims, [*id.*]; and "Defendants continued for years to submit claims falsely representing that they were entitled to be paid at higher prices as a result of the so-called acquisition," [*id.* at ¶ 2].  Plaintiff further avers that Defendants' actions "continued year after year through this year" and allege the existence of "fraudulent document productions in 2019, 2020, and 2021," "fraudulent notarized certifications" in 2021 and 2023, and finally "fraudulent sworn interrogatory answers in 2024."  [*Id.* at ¶ 126].

**Closed-Ended Continuity.**  Plaintiff's allegations, taken as true, demonstrate at least two predicate acts of wire fraud that span over a period of at least ten years. *H.J.,*

*Inc.*, 492 U.S. at 242; 18 U.S.C. § 1961(5) (stating that a "pattern of racketeering activity" requires at least two predicate acts within ten years); *cf. Alter v. DBLKM, Inc.*, 840 F. Supp. 799, 809 (D. Colo. 1993) ("[Six to seven months] is not a long enough period to state a close-ended RICO claim."). But duration alone is insufficient. *Johnson*, 56 F.4th at 860 (stating that pleadings indicating predicate acts over "multiple years. . . supports finding closed-ended continuity"). The Court must also consider "the extensiveness of the alleged racketeering scheme." *Id.*

"When evaluating extensiveness, [courts] consider the number of victims, the number of racketeering acts, the variety of racketeering acts, whether the injuries were distinct, the complexity and size of the scheme, and the nature or character of the enterprise." *Id.* (quotation omitted). While the racketeering fraudulent activities permeated the business relations between the Parties and non-party UNA, Plaintiff has not pleaded that the racketeering enterprise targeted any other "persons or entities" aside from Optum itself and also does not indicate that the scheme had the potential to impact other entities. *See SIL-FLO, Inc. v. SFHC*, 917 F.2d 1507, 1516 (10th Cir. 1990). Allegations that the scheme impacted Optum alone are insufficient to demonstrate closed-ended continuity. *Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1555 (10th Cir. 1992) (finding that the plaintiffs failed to plead continuity when the plaintiffs alleged a closed-ended series of acts that constituted a single scheme directed at a finite group of individuals); *DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1183 (D. Colo. 2019) (finding that the plaintiff failed to plead continuity when it demonstrated that it was the sole target of a racketeering scheme). The Court finds that Plaintiff's allegations fail to satisfy the closed-ended continuity standard.

*Open-Ended Continuity.*    Plaintiff also alleges that Defendants "were, and remain, actively engaged in a fraudulent racket" with UNA, Mr. Jumonville, and Mr. Davies.  [Doc. 95 at ¶ 4].  Plaintiff points to the April 2024 production of the Alpert File as evidence that the scheme is ongoing.  [Doc. 101 at 10].  The Court is not convinced that Plaintiff has pleaded "open-ended" continuity on this basis alone.  *See SIL-FLO*, 917 F.2d at 1516 (concluding that the plaintiff failed to plead open-ended continuity when plaintiff alleged "a business deal gone sour" as well as breach of fiduciary duty and various torts).  "Abusive litigation, alone, cannot form a proper predicate act under RICO."  *Abbondanza v. Weiss*, No. 19-cv-00328-JLK, 2019 WL 10255013, at *3 (D. Colo. Oct. 23, 2019) (citing *Bixler*, 596 F.3d at 751).  And unlike *Abbondanza*, the alleged acts of wire fraud and mail fraud associated with this action are not external to this suit because the goal is to produce a favorable outcome for Defendants.  *Id.*  Thus, Plaintiff has failed to sufficiently plead a pattern of racketeering activity.

### b.    Section 1962(d) Claim

To successfully state a claim under § 1962(d), a Plaintiff "must plead with particularity an agreement to a pattern of racketeering activity, and an agreement to the statutorily proscribed conduct."  *Brooks*, 891 F. Supp. at 1479.  If a plaintiff fails to plausibly plead a § 1962(c) violation, a § 1962(d) claim necessarily fails.  *List Interactive, Ltd.*, 2017 WL 3217817, at *15 n.8.  As discussed herein, Plaintiff has failed to plausibly plead a violation of § 1962(c), so its allegations under § 1962(d) necessarily fail and require no further discussion.  *Id.*

Based on the analysis herein, the Motion for Partial Dismissal is **GRANTED in part** to the extent it seeks dismissal of Plaintiff's RICO claims against NBBI for failure to state a claim under Rule 12(b)(6).

## II.    Plaintiff's Motion to Dismiss Counterclaim

Plaintiff asserts three arguments for the dismissal of NBBI's Counterclaim under Rule 12(b)(6):  (1) NBBI does not own its Counterclaim because NBBI sold all claims to UNA in December 2013, [Doc. 108 at 9–10]; (2) even if NBBI owns the claim, under Rules 8 and 11, NBBI cannot plead contrary facts to those it has pleaded throughout this litigation and in other contexts, [*id.* at 11–12]; and (3) even if NBBI owns the claim, it has failed to plead the claim with the requisite particularity under Rule 9(b), [*id.* at 12–16]. Plaintiff notes that while it continues to contend that the December 2013 sale was fraudulent, Plaintiff "treats as 'true' NBBI's factual allegation that it sold its claims to UNA" in December 2013.  [*Id.* at 2 n.1].  NBBI responds that its Counterclaim "stems from Optum's failure to make payments under the NBBI Agreement between 2006 and 2013," but to the extent that the Court finds that UNA did not acquire the NBBI's prescription discount card program, NBBI would be entitled to recover for breaches under the NBBI Agreement after 2013.  [Doc. 114 at 7, 9 n.3].  Accordingly, this Court does not address Plaintiff's arguments that the Counterclaim is impermissibly at odds with NBBI's factual contention that its discount card business was sold to UNA in December 2013 at this time.

### A.    Rule 9(b)

Plaintiff argues that NBBI's counterclaim is grounded in allegations of fraud, Rule 9(b)'s heightened pleading standard applies, and NBBI fails to meet that standard.  [Doc. 108 at 12–16].    NBBI responds that its Counterclaim is not subject to Rule 9(b)'s

heightened pleading standard because "fraud is not an element of NBBI's claim for breach

of contract" and thus it must only meet the standard under Rule 8.  [Doc. 114 at 9–12].[19]

It is well-established in the Tenth Circuit that Rule 9(b)'s heightened standard

applies to any claim "sounding in fraud."  *Touchtone Grp., LLC v. Rink*, 913 F. Supp. 2d

1063, 1076 (D. Colo. 2012); *Hardy v. Flood*, No. 17-cv-00677-CMA-MJW, 2018 WL

1035085, at *3 (D. Colo. Feb. 23, 2018) ("Any claim . . . may be subject to Rule 9(b)'s

heightened pleading standard if the claim [or defense] is grounded in fraud." (quotation

omitted)); *Great Lakes Ins., S.E. v. Highland W. LLLP*, No. 19-cv-00508-LTB, 2019 WL

11641301, at *3 (D. Colo. Aug. 2, 2019) (breach of contract claim that alleged intentional

misrepresentation was subject to Rule 9 requirements).  NBBI argues that in the cases in

which this District has concluded that Rule 9(b) applies to a breach of contract claim, "the

viability of the breach of contract claim or defense depended on the existence of fraud,"

such that the cases are distinguishable because fraud is not an element of NBBI's breach

of contract claim.  [Doc. 114 at 10; *id.* at 9–10 (first citing *Great Lakes Ins., S.E*, 2019 WL

11641301, at *2; then citing *Duran v. Homesite Ins. Co.*, No. 24-cv-00635-NYW-NRN,

---

[19] Plaintiff also argues that NBBI's Counterclaim is untimely because it falls outside the
statute of limitations.  [Doc. 108 at n.4].  In the Tenth Circuit, a statute of limitations
defense is only subject to a motion to dismiss "when the dates given in the complaint
make clear that the right sued upon has been extinguished."  *Aldrich v. McCulloch Props.,
Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980).  Here, the discussion of the statute of
limitations is relegated to footnote in which Optum concedes that it "cannot address this
statute of limitations issue adequately due to the lack of specificity on the timing of the
alleged misconduct."  [Doc. 108 at 16 n.4].  While this Court is once again troubled by the
fact that NBBI did not cite the order vacating the opinion upon which it relies to apply
Colo. Rev. Stat. § 13-80-109 in federal court, *see* [*id.* (citing *White River Vill., LLP v. Fid.
& Deposit Co. of Md.*, No. 08-cv-00248-REB-MEH, 2014 WL 985103 (D. Colo. Mar. 12,
2014), *opinion vacated on reconsideration on other grounds*, 2015 WL 13936384 (D.
Colo. Mar. 12, 2015))], Plaintiff has failed to carry its burden to show that the statute of
limitations precludes the Counterclaim and no further discussion is warranted at this time.

2024 WL 4884484, at *3 (D. Colo. Nov. 25, 2024); and then citing *Hardy*, 2018 WL
1035085, at *4)].  NBBI argues that it does not allege that "Optum's deceptive conduct
was necessarily intentional, as opposed to merely negligent."  [*Id.* at 10].

 *Rule 9(b) Applies.*  NBBI's arguments that Rule 9(b) does not apply to its breach
of contract Counterclaim are not well-taken.  *See* [*id.* at 9–12].  As an initial matter, this
Court respectfully disagrees with NBBI's characterization of its own counterclaim.  The
language in NBBI's allegations connotes deceit.  NBBI states that "unbeknownst to NBBI,
Optum would alter the D.0 data and destroy the original unaltered data," [Doc. 107 at 18
¶ 11]; "Optum . . . further manipulated . . . the data," [*id.* at 19 ¶ 13]; Optum created a
"cooked set of numbers," [*id*. at 19 ¶ 14]; "unbeknownst to NBBI . . . Optum used two sets
of books," [*id.* at 19 ¶ 15]; and Optum reported claims differently to "avoid paying a
Compensable Claim Fee . . . [and] pocketed the difference . . . in an effort to avoid paying
NBBI a Compensable Claim Fee," [*id.* at 19 ¶ 16].  Indeed, the Counterclaim explicitly
refers to the "Client Side" data created by Optum as "the 'Cooked Book.'"  [*Id.* at 19 ¶¶
14–15].  Rule 9's applicability turns not on the title of the claim or defense or the pleader's
own framing of the claim or defense, but on the nature and substance of the supporting
allegations.  Regardless, courts in this District have stated, "[w]henever a cause of action
requires misrepresentations that are *intentional or negligent*, the heightened pleading
requirements of Fed. R. Civ. P. 9(b) apply."  *Great Lakes Ins., S.E.*, 2019 WL 11641301,
at *2 (emphasis added).

 *Whether NBBI Meets the Heightened Pleading Standard.*  Plaintiff contends
that NBBI fails to meet Rule 9(b)'s heightened pleading standard because NBBI alleges
an "eighteen-year data manipulation campaign" but NBBI "fail[s] to specify any details,"

"does not identify a single individual (or even a position) at Optum responsible for this multi-decade scheme," and "never references a single specific email, report, letter, or other communication from Optum to NBBI that was inaccurate." [Doc. 108 at 15–16]. The Tenth Circuit "requires a complaint alleging fraud to set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quotation omitted).

The Court agrees with Plaintiff that NBBI does not identify particular people, dates, or documents upon which its Counterclaim depends. *See* [Doc. 107 at ¶¶ 21–27]. But the factual allegations set forth in paragraphs 5–26 of the Counterclaim clearly set forth its basis: (1) the NBBI Agreement required Optum to pay NBBI a Compensable Claim Fee as defined in the Agreement and described in the fee schedule [*id.* at 17–18 ¶¶ 6–7]; (2) the term "Usual and Customary Charge" in the NBBI Agreement is defined as "the price for a pharmaceutical a pharmacy in the Pharmacy Network would charge to a person that does not hold a Prescription Discount Card and does not participate in any type of plan or program whatsoever that provides coverage for pharmaceuticals"; [*id.* at 18 ¶ 8]; (3) when Optum would process a claim submitted by NBBI, Optum would receive data from the pharmacy on the claim transaction that was industry standard data information, called D.0, [*id.* at 18 ¶ 10]; D.0 is a set of defined fields and parameters which pharmacy dispensing software and third-party claims software use within the claims submission process that was developed by the National Council on Prescription Drug Programs, [*id.* at 18 ¶¶ 9–10]; (4) upon receipt of the D.0, and unbeknownst to NBBI, Optum would alter the D.0 data and destroy the original unaltered data and kept the altered information in

what Optum referred to as "Pharmacy Side" data, [*id.* at 18 ¶¶ 11–12]; (5) Optum then further manipulated the Pharmacy Side data to redirect money from appropriate D.0 fields through a process Optum referred to as the "Waterfall" process which resulted in another set of data, which Optum called the "Client Side" data, [*id.* at 19 ¶¶ 13–14]; and (6) on many occasions if a Claim was priced less than the U&C Price (and thus a Compensable Claim for NBBI), Optum surreptitiously raised the price to match the U&C Price, represented to the pharmacy that it was a "paid claim," pocketed the difference, and reported the Claim to NBBI as a "U&C Claim" to avoid paying NBBI a Compensable Claim Fee, thereby breaching the NBBI Agreement, [*id.* at 19 ¶ 16].  "The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992) (quotation omitted).  While NBBI does not identify each and every discrete pharmacy claim to which this theory applies, it need not do so at this juncture.  *See Sunbird Air Servs., Inc. v. Beech Aircraft Corp.*, 789 F. Supp. 364, 366 (D. Kan. 1992) (observing that Rule 9(b) does not require the complaint to recite the evidence or plead detailed evidentiary matter, or to supplant general discovery methods).

Accordingly, based on the analysis contained herein, the Motion to Dismiss Counterclaim is respectfully **DENIED**.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendants' Motion to Partially Dismiss Plaintiff's First Amended Complaint Pursuant to Fed. R. Civ. P. 9(b), 12(b)(1), 12(b)(2) and 12(b)(6) [Doc. 97] is **GRANTED in part**;

a.   Counts I, II, IV, V, and VII against Defendants Raymond J. Marszalowicz, Kevin Faherty, and Barry J. Forester, are **DISMISSED without prejudice** for lack of personal jurisdiction;

b.   Counts IV and V against Defendant National Benefit Builders, Inc. are **DISMISSED without prejudice** for failure to state a claim pursuant to Rule 12(b)(6);

(2)   Defendants' Motion to Partially Dismiss Plaintiff's First Amended Complaint Pursuant to Fed. R. Civ. P. 9(b), 12(b)(1), 12(b)(2) and 12(b)(6) [Doc. 97] is **DENIED in part** to the extent it seeks dismissal of Plaintiffs' tort claims as set forth Counts I, II, and VII against Defendant National Benefits Builders, Inc.; and

(3)   Plaintiff's Motion to Dismiss Defendant National Benefit Builders, Inc.'s Counterclaim Under Fed. R. Civ. P. 12(b)(6) [Doc. 108] is **DENIED**.

DATED:  September 12, 2025                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge